**CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY, Plaintiff–Appellee, Cross–Appellant,**

v.

**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Defendants–Appellants, Cross–Appellees.**

Nos. 89–3265, 89–3436.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1990.

Decided July 17, 1990.

Rehearing and Rehearing En Banc Denied Aug. 21, 1990.

Stuart F. Gassner, Myles L. Tobin, James P. Daley, Ronald J. Cuchna, Chicago Northwestern Ry., Co., Law Dept., Chicago, Ill., Ralph J. Moore, Jr., D. Eugenia Langan, John R. Cooke, Shea & Gardner, Washington, D.C., for plaintiff-appellee.

Solomon I. Hirsh, Dale D. Pierson, Baum & Sigman, Chicago, Ill., John O'B. Clarke, Jr., Janet K. DeCosta, Highsaw, Mahoney & Clarke, Washington, D.C., for defendants-appellants.

Before POSNER, EASTERBROOK, and MANION, Circuit Judges.

POSNER, Circuit Judge.

These appeals, which pit the owner of a large midwestern railroad against the unions that represent its workers, present intricate questions under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, as well as a difficult question of appellate jurisdiction.

Like many American railroads, the C & NW in recent years has been busy discontinuing service on unprofitable lines. Until 1986 it did this by abandoning lines pursuant to the standards for abandonment established by the Interstate Commerce Commission; among these standards is the requirement that the abandoning railroad "protect" the workers adversely affected by the abandonment by giving them generous severance pay. Through abandon-

ments the C & NW shrank to half its former size and laid off 6,000 employees. But beginning in 1986 the railroad took a different tack, selling abandoned lines (however cheaply) rather than abandoning them, and doing so under new procedures that not only enabled the ICC's approval for the transaction to be obtained swiftly but also, and much more important, excused the railroad from having to protect employees affected by the sale. *Ex Parte No. 392*, 1 I.C.C.2d 810, 815 (1985), review denied without opinion under the name *Illinois Commerce Commission v. ICC*, 817 F.2d 145 (D.C.Cir.1987). See generally *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2584, 2590–91, 105 L.Ed.2d 415 (1989).

The unions had not claimed that the abandonments violated their collective bargaining agreements, and had not otherwise objected. For in addition to the protective conditions imposed by the ICC in abandonment cases, the collective bargaining agreements protected the seniority rights of the affected employees. An employee laid off by reason of an abandonment could "bump" an employee elsewhere in the C & NW system who had less seniority, provided the senior employee was qualified to perform the junior's job. Unions tend to favor older over younger workers. This is because, for a variety of reasons including the fact that job mobility tends to lessen with age, older workers tend to support unions more strongly than younger workers do. Between bumping rights and severance pay, older workers—especially those near retirement—were well protected against the disemployment effect of line abandonments. But when the C & NW switched from abandonment to sale, this happy picture changed. Gone was the generous severance pay. The senior workers were still protected in their bumping rights, but with the C & NW system shrinking rapidly there were fewer jobs for either the bumpers or the bumped. Moreover, older workers, with stronger ties to the local community on average than younger ones (which is why older workers tend to have less job mobility), are reluc-

tant to pull up stakes and move to a different geographical area; yet moving will often be necessary to take advantage of bumping rights.

A partially offsetting consideration is that the purchaser of the line may decide to retain the workers who have been working on it. Despite this possibility, the unions were upset when the C & NW abandoned abandonments for sales, and the first thing they did was file a notice under section 6 of the Railway Labor Act, 45 U.S.C. § 156, which provides that "carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions." The notice, as section 6 goes on to provide, obligates the parties to meet and negotiate over the proposed change and, if the negotiations fail, to submit the dispute to mediation. Only after all means to a peaceful resolution have been exhausted may the party who filed the section 6 notice strike, if it is the union, to coerce the other party to comply with its demands, or, if it is the employer, implement the proposed change. The notice that the unions served on the C & NW demanded that the collective bargaining agreements be modified to impose protective conditions on line sales similar to the protective conditions that the ICC imposes on abandonments.

At the time the notice was filed (1987), the C & NW had announced its intention to sell its 208–mile–long "Duck Creek South" line in Wisconsin to another railroad, but had not completed the transaction. Although the C & NW took the position that it was not required to bargain over the right to sell parts of its system, it did meet with the unions' representatives to discuss the effects of the sale on the employees, and that matter is now in mediation. But it refused to delay the sale's consummation. The unions threatened to strike if the sale was consummated. They argued that consummation would violate the provision of section 6 that during the negotiating process kicked off by the section 6 notice "rates of pay, rules, or working conditions shall not be altered by the carrier." The

railroad then filed this suit. It sought preliminary and permanent injunctive relief against the unions' striking over the Duck Creek South sale, plus an order directing the union to submit the dispute to an adjustment board, which is an arbitral body ordained by the Railway Labor Act.

In support of these requests the railroad contended that the dispute was "minor" rather than "major." These terms are not to be taken in their ordinary sense; they are terms of art in the case law under the Railway Labor Act (they do not appear in the Act itself). *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 2477, 2479–82, 105 L.Ed.2d 250 (1989); *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2589 n. 4; *Air Line Pilots Ass'n v. UAL Corp.,* 874 F.2d 439, 443–44 (7th Cir.1989). It would be more informative to call a major dispute a "modification" dispute and a minor dispute an "interpretation" dispute. But it may be too late to change the terminology.

■ In any event, a major dispute is a dispute to which section 6 procedures are applicable—a dispute kicked off by the filing of a notice of desire to modify existing collective bargaining agreement. The terminus of such a dispute, if the procedures set forth in section 6 fail to produce agreement between the parties, is a strike. A minor dispute is a dispute "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). Hence it is one that can be resolved conclusively by interpretation of the collective bargaining agreement. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2481; *General Comm. of Adjustment v. CSX Railroad Corp.,* 893 F.2d 584, 586 (3d Cir.1990). In other words, a minor dispute is one over the interpretation or application of the collective bargaining agreement (for a grievance is merely a complaint that arises under the agreement, *Lancaster v. Norfolk & Western Ry.,* 773 F.2d 807, 814 (7th Cir.1985)), while a major dispute is one in which the carrier or employer wants to change the agreement.

■ Minor disputes are governed by the procedures for compulsory arbitration established by section 3 of the Act precisely to enable conclusive resolution of interpretive disputes. Compulsory arbitration is the statutory substitute for strikes and other work action by which unions in other industries have often tried to enforce their interpretation of a collective bargaining agreement (in the absence of a no-strike clause), but which are thought unduly disruptive in the transportation industry. Unlike manufacturing industries and even some service industries, the transportation industry does not produce a storable commodity, and so it cannot produce for inventory in anticipation of a strike or accelerate production afterward to make up for lost production during the strike. It is therefore peculiarly vulnerable to a strike.

Agreeing that the dispute over the protective conditions was minor and therefore that the union's only remedy lay with arbitration, the district court granted the preliminary injunction sought by the railroad. We affirmed, *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n,* 855 F.2d 1277 (7th Cir. 1988), and the sale of the Duck Creek South line was then consummated. But the lawsuit was not over. The railroad wanted the injunction made permanent, so that it would not expire when the arbitration ended. The parties also disgreed as to how the district judge should frame the issue for arbitration in the order directing the parties to arbitrate. (Whether the district judge *has* the power to frame the issues for arbitration under the Railway Labor Act is an issue we discuss later.) The railroad wanted the issue to be: Had the Duck Creek South sale violated the collective bargaining agreements? The unions wanted it to be: What entitlements did the former workers on the Duck Creek South line have, in light not only of the provisions of the collective bargaining agreements but also of the railroad's practice, which in the case of abandonments had been to provide generous severance

pay, as required by the Interstate Commerce Commission in abandonment cases? Moreover, the unions had filed a counterclaim. In it they sought an injunction to preserve their conception of the status quo and specifically, therefore, to prevent the C & NW from laying off any workers who had not been hired by the purchaser of the Duck Creek South line. They also sought an order that the railroad bargain over the demands in the unions' section 6 notice—which the railroad had been doing in part only, bargaining just over the effects of the sale on the workers and refusing to discuss the propriety of making this or future sales without including protective conditions.

The district court split the difference. The judgment states that "we grant [C & NW's] motion for a permanent injunction and we dismiss RLEA's counterclaim.... This dispute will be arbitrated ..., and we have herein determined the issue to be arbitrated." The "herein" refers to the statement in the district court's accompanying opinion that the arbitrators are "to decide what treatment, in terms of pay (severance or otherwise), seniority rights, benefit rights, transfer rights, etc., the employees of C & NW (who are affected by the line sale) are entitled to in terms of contractual provisions and attendant past practices." The unions appeal from the grant of the permanent injunction to the railroad and the dismissal of their counterclaim, and the railroad cross-appeals, challenging the terms on which the judge referred the matter to arbitration.

■■■ The question of appellate jurisdiction is this: Rule 65(d) of the Federal Rules of Civil Procedure requires that an order granting an injunction set forth the terms of the injunction and *not* do so by reference to a complaint or other document. The purpose is to provide a solid foundation for any subsequent proceeding to enforce the injunction, as by a motion to hold the defendant in contempt. The judgment that the district court issued, quoted above, does not comply with Rule 65(d), because it does not spell out the terms of the injunction but instead refers the reader to the accompanying opinion. If the consequence

is that there is no injunction in force, then at least insofar as the unions are seeking to appeal from the grant of an injunction (for that is not all they are seeking to appeal from) we lack jurisdiction because then there is no case or controversy as these words are used in Article III of the Constitution.

■■■ The point is not that Rule 65(d) is jurisdictional in the sense that its requirements are nonwaivable, so that any failure to comply with those requirements would make the injunction a nullity even if no party had ever objected. The rule is not jurisdictional in that sense, *Gunn v. University Comm. to End War in Viet Nam*, 399 U.S. 383, 389 n. 4, 90 S.Ct. 2013, 2017 n. 4, 26 L.Ed.2d 684 (1970), although what is true is that a district judge has not only the power but also the duty to refuse to enter a defective injunction even if neither party objects. An injunction imposes burdens on the court that issues it and potentially affects the rights of third parties; on both grounds the court has a duty independent of the desires of the parties to assure that the injunction is proper. *Okaw Drainage District v. National Distillers & Chemical Corp.*, 882 F.2d 1241, 1248 (7th Cir.1989); *Parks v. Pavkovic*, 753 F.2d 1397, 1404 (7th Cir.1985). The point, rather, is that if by reason of not complying with Rule 65(d) the order issued by the district court is not an injunction at all, it places the defendant under no obligations; and an order that is not actually or at least potentially coercive (whether an injunction, an award of damages, a prison sentence, or any other binding directive, including—the most attenuated example—a declaratory judgment) does not impose the sort of tangible harm that Article III requires for standing to seek judicial relief, including relief in the form of an appellate judgment. It is just an advisory opinion. By this analytic route we see that a violation of Rule 65(d) can compel the dismissal of an appeal. *Azeez v. Fairman*, 795 F.2d 1296, 1297 (7th Cir. 1986); *Bethune Plaza, Inc. v. Lumpkin*, 863 F.2d 525, 527–28 (7th Cir.1988); *Bates v. Johnson*, 901 F.2d 1424 (7th Cir.1990).

 But we think there is an enforceable injunction here. This is not primarily because the district judge's memorandum opinion, which states in spare but sufficient detail the terms of the injunction, is captioned "Memorandum Opinion *and Order*" (emphasis added) and states in its conclusion: "we grant [C & NW's] motion for a permanent injunction." This is compliance with the letter of Rule 65(d), which refers to orders rather than to judgments, but not with the spirit. When Rule 65(d) is read in conjunction with Rule 58, which requires that any nonmonetary as well as any monetary relief granted by the district court be set forth in a judgment order separate from the court's opinion, it becomes apparent that the terms of the injunction should appear in the Rule 58 order as well. Nevertheless, the form of the opinion in this case comes so close to satisfying the requirements of Rule 65(d) that it is possible to regard the violation of that rule as technical rather than substantial, bearing in mind that the requirement of a separate judgment order in Rule 58 is not itself jurisdictional. *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978).

Our second and decisive point is that a *preliminary* injunction had been issued, had been appealed without its efficacy being questioned, and had been upheld by this court; and the preliminary injunction contained the identical terms, except of course with regard to duration (it would expire when the arbitration panel issued its award), that the C & NW was seeking in the permanent injunction. When Judge Plunkett granted the permanent injunction, it was understood by all concerned that the terms, except as to duration, were the same as those of the preliminary injunction. The duration of a permanent injunction is indicated by the name, and requires no further specification: it is forever, unless dissolved. Since there was no possible uncertainty about the terms of the permanent injunction, the spirit of Rule 65(d) was honored after all. Any doubt on this score was dispelled by the unions' lawyer at oral argument. He said that the unions are bound by the permanent injunction and,

specifically, that they are subject to being held in contempt if they violate it. He thereby admitted that if the unions violated the injunction, they could not defend themselves in a contempt proceeding on the ground that there was no injunction. *Bethlehem Mines Corp. v. United Mine Workers*, 476 F.2d 860, 862 (3d Cir.1973). He tried to retract this concession by a subsequent filing but we are not obligated to permit the retraction, especially as, we think he was right the first time. Just as in *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632–33 (2d Cir.1976), and *Bethlehem Mines Corp. v. United Mine Workers, supra*, 476 F.2d at 862, the injunction was in sufficient if imperfect compliance with the rules to be enforceable. See also *Drummond Co. v. District 20*, 598 F.2d 381, 385 (5th Cir. 1979); cf. *Bethune Plaza, Inc. v. Lumpkin, supra*, 863 F.2d at 528.

 The unions argue that there is an even stronger requirement of specificity in a *labor* injunction, citing section 9 of the Norris–LaGuardia Act, 29 U.S.C. § 109—so strong a requirement, they say, that the failure to satisfy it renders the injunction void. The Act is of course founded on hostility to labor injunctions. But so far as is relevant to this case, all section 9 requires is that the injunction be limited to "a prohibition of such specific act or acts ... as shall be expressly included in ... findings of fact" made by the district court. The Memorandum Opinion and Order satisfies this requirement. There was not even a technical violation of section 9, cf. *Drummond Co. v. District 20, supra*, 598 F.2d at 385; and the technical violation of Rule 65(d), as we said, did not void the injunction.

 Insofar as the Rule 58 judgment order dismisses the counterclaim, there is no possible doubt about appellate jurisdiction over that dismissal. But the issue that we have been discussing recurs when we turn to the remaining part of the judgment, the order to arbitrate a question stated not in the judgment itself but in the accompanying opinion. Orders to arbitrate, when final (an important qualification not applicable to other injunctions), are mandatory

injunctions. *University Life Ins. Co. of America v. Unimarc Ltd.*, 699 F.2d 846, 849 (7th Cir.1983). (The distinction between interlocutory and final orders to arbitrate is maintained in the recent amendments to the Federal Arbitration Code. 9 U.S.C. § 15.) They therefore are subject to Rule 65(d), and much of our previous analysis is applicable. In particular, the parties have treated the order to arbitrate as a binding injunction that the unions (the recalcitrant party) could not disobey without exposing itself to a contempt judgment. A further point is that the only thing missing from the Rule 58 judgment order is the question to be arbitrated, and there is considerable doubt as we shall see that the district judge has the power under the Railway Labor Act to specify the questions for arbitration.

So we have jurisdiction. But not for the first time we beseech the district judges of this circuit to obviate disputes over appellate jurisdiction by paying careful attention to the requirements of the rules governing orders and judgments.

The decisive issue on the merits is whether what we have here is a major dispute or a minor one. If the railroad, acknowledging that the collective bargaining agreements forbade it to sell a line without protecting the affected employees or at least negotiating with the unions over the consequences for those employees, had filed a section 6 notice demanding a modification of the agreements to free its hand, it would have inaugurated a major dispute, and the status quo provision in section 6, which we quoted earlier, would have barred it from selling the Duck Creek South line until the procedures in that section for resolving the dispute were exhausted. That is not what. happened. As the unions now concede, nothing in the agreements forbade the sale of the line with or without protective conditions (other than the bumping rights that the agreements confer), so the railroad was not proposing to modify the agreements and therefore was under no obligation to file a section 6 notice. Since it was not bound to file such a notice, neither was it bound to. maintain the status quo, at least as required by that section, for the status quo requirement in section 6 is triggered by the filing of the notice.

█ It is true that section 2 Seventh of the Act also requires maintenance of the status quo. It says that "no carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section [6]." 45 U.S.C. § 152 Seventh. This provision is necessary in order to prevent a carrier from circumventing the status quo requirement in section 6 by simply not filing a section 6 notice. But insofar as the existing agreements do not limit the railroad's right to sell a line, so that the railroad is not seeking to modify the agreements and therefore was not obliged to file a section 6 notice, section 2 Seventh is inapplicable unless the sale of the line should be deemed a change in pay, work rules, or working conditions embodied in the collective bargaining agreements. We shall see that it should not be.

█ It was the filing by the *unions* of a section 6 notice that, they argue, required the railroad to freeze the status quo and not complete the Duck Creek South sale, and so entitled them to strike when the railroad decided to go ahead with the transaction. Section 6 itself states that whether the carrier or the union files the notice, the carrier may not alter the status quo until the section 6 procedures are exhausted— provided that the notice makes a demand that the carrier is required to bargain over. A union cannot freeze the status quo by demanding negotiations over something that the carrier is entitled to do unilaterally either because the collective bargaining agreement authorizes the carrier to do it or because it is within the carrier's "management prerogatives," the class of decisions that are not decisions about rates of pay, rules, or working conditions and so are outside the scope of the status quo provision altogether. *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Association, supra,* 109 S.Ct. at 2595. A demand for bargaining that is outside that scope imposes no obligations on the carrier.

■ The two types of carrier's entitlement to act unilaterally—contractual and prerogative—are not sharply distinct, if indeed they are distinct at all. A matter of prerogative is one the carrier is not required to bargain over and therefore is unlikely to surrender in bargaining, though nothing in the Act forbids it to do so. *Order of Railroad Telegraphers v. Chicago & North Western Ry.*, 362 U.S. 330, 337–40, 80 S.Ct. 761, 765–67, 4 L.Ed.2d 774 (1960). If there has been no waiver of prerogative in the collective bargaining agreement, then the union cannot insist that the carrier bargain over prerogative matters, such as executive perks, recapitalization, rates charged shippers, and other matters that are only indirectly—though often vitally—related to the status of the workers represented by the union. The union's insistence on bargaining over such matters confers no rights under section 6.

The C & NW contends that the sale of a line is indeed a management prerogative, citing the Supreme Court's recent decision in *Pittsburgh & Lake Erie*, which held—in part on prerogative grounds—that a railroad is not required to bargain over its decision to leave the business. 109 S.Ct. at 2593–97. Like the Eighth Circuit in *Railway Labor Executives' Ass'n v. Chicago & Northwestern Transportation Co.*, 890 F.2d 1024 (8th Cir.1989), we agree that the logic of *Pittsburgh & Lake Erie* embraces the sale of a line. Cf. 109 S.Ct. at 2595 n. 17, citing *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981). We further agree that *Detroit & Toledo Shore Line R.R. v. Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), which held the designation of work stations not to be a matter of management prerogative, and was rather roughly handled in *Pittsburgh & Lake Erie*, 109 S.Ct. at 2594, is distinguishable. The decision to sell a line is not a decision about the utilization of labor or about wages, work rules, working conditions, job rights, etc. It is a decision to reduce the extent of the railroad's business, akin to a manufacturer's decision to curtail its output or to retire unneeded capacity without replacing it. It

is not a decision about labor inputs. It has of course consequences for the workers—any major business decision does. But if this were enough to make it a change in pay, work rules, or working conditions, then every significant business decision that a carrier made would be a mandatory subject of collective bargaining; there would be no management prerogatives; and *Pittsburgh & Lake Erie*, which holds that the carrier is not required to bargain over the sale of its business, would be incoherent.

Whether the reduction in output or capacity is to zero is a detail, and a messy one, since it would be absurd to make a railroad bargain over the sale of 99 percent of its lines but not over the sale of 100 percent. The emphasis that the Court in *Pittsburgh & Lake Erie* placed on the desirability of interpreting the Railway Labor Act in harmony with the deregulatory amendments to the Interstate Commerce Act under which the Commission was acting when it simplified railroad sales, 109 S.Ct. at 2596–97, applies with even greater force to line sales than to system sales, the former being so much more common than the latter.

Our decision in *Burlington Northern R.R. v. United Transportation Union*, 862 F.2d 1266 (7th Cir.1988), which held that a dispute over a trackage rights agreement was subject to section 6, is distinguishable. A trackage rights agreement is much like a line sale—in the normal case. But the case was not normal. The agreement had not been made at arm's length; it was between a parent and its wholly owned subsidiary; we concluded that it was in fact a device for altering the make-up of the parent's train crews. *Id.* at 1273–74.

■ It is a separate question whether a railroad that sells a line must bargain over the *effects* of the sale on the affected employees if the union so demands by filing a section 6 notice. *Pittsburgh & Lake Erie* answers "yes" in the case of exiting the business, and for reasons just explained the same answer must be given in the case of a line sale, and was in the Eighth Circuit's companion case to ours. 890 F.2d at

1025–26. But the relevant holding of *Pittsburgh & Lake Erie*—since the parties in our case *are* bargaining over the effects of the sale (the matter is in mediation, one of the minuettes in the section 6 quadrille)—is that the right to demand "effects bargaining" does *not* entitle the union to prevent the sale. This is a familiar, not an esoteric, principle of labor law. *First National Maintenance Corp. v. NLRB, supra,* 452 U.S. at 677 n. 15, 101 S.Ct. at 2580 n. 15; *International Union v. NLRB,* 802 F.2d 969, 972 (7th Cir.1986). The sale is separate from the consequences and is allowed to go through while the consequences are being bargained over. Otherwise transactions potentially vital to the company, and to the ICC's program of deregulation of the rail industry, would be stymied. It is now three years since the Duck Creek South sale was proposed and two since it was consummated. It could not have been consummated if the unions' filing of a section 6 notice had frozen the transaction in its tracks.

The unions want us to infer from the Supreme Court's insistence on effects bargaining that what the Court gave management with one hand it took back with the other, and that the dispute over the Duck Creek South sale really is, therefore, a major dispute, as the opinion in the Eighth Circuit's companion case states. 890 F.2d at 1026. It would be, if the railroad refused to bargain over effects (this we take it is the meaning of the Eighth Circuit's ruling). But transaction bargaining (in other industries, it might be over the relocation of a plant, *International Union v. NLRB, supra* ) and effects bargaining are not the same thing. The difference is in the timing, and is vital. The unions want to strike in protest against, and if possible undo, the Duck Creek South sale; this they may not do and so the railroad can go ahead and complete it, as it has done. The railroad is prepared to take its chances on the outcome of bargaining over the sale's effects on its workers. Maybe in the end it will agree to modify the collective bargaining agreements to pay these workers some severance pay. But meanwhile it has sold the line, pocketed the proceeds, streamlined its business.

■ Although the unions can make the railroad bargain over the effects of the Duck Creek South sale on the workers, the district judge was right to deny the unions' request for a bargaining *order.* Judicial intervention in labor disputes is not favored; and no order is needed to compel what is already being done—and in perfect good faith on the part of both parties, so far as we are able to determine. The railroad does not deny its duty to bargain over effects. Its only reservation concerns its obligation to bargain over its right to make the sale. That reservation is well founded.

■ There may be another route to the conclusion that the railroad did not alter the status quo by completing the sale of the Duck Creek South line. Even if we are wrong that the railroad has no obligation to bargain over the sale itself, and even if, therefore, the unions' section 6 notice froze the status quo, there has been no violation of the status quo provision in section 6 (or section 2 Seventh) because the sale does not violate the status quo *as defined* by the collective bargaining agreements. Granted, the obligation to maintain the status quo may outlast the particular collective bargaining agreements that are in force. One purpose of the status quo requirement is to maintain the essential provisions of the collective bargaining agreements between the expiration of the existing agreements and the negotiation of new ones. *Air Line Pilots Ass'n v. UAL Corp.,* 897 F.2d 1394, 1398 (7th Cir.1990). But this qualification to one side, what the agreements do not forbid, either explicitly or implicitly (and it is in the latter connection that *practices* are important, as we shall see), the railroad is allowed to do as a matter of contract; and what the railroad is allowed to do *is,* one might suppose (with support from a footnote in *Pittsburgh & Lake Erie,* 109 S.Ct. at 2594 n. 15), the status quo, even if the railroad has not been doing it. Redecorating the railroad's executive dining room does not violate the status quo even if this is the first time the room has ever been redecorated and the

collective bargaining agreement is silent about redecoration. The unions now concede, as we have said, that nothing in their collective bargaining agreements forbids the railroad to sell lines, whether piecemeal or all at once. The status quo is not a fixed number of lines.

■ If *this* is wrong—if the collective bargaining agreements do not define the status quo exhaustively—still the unions lose. Suppose that the railroad's obligation to maintain the status quo upon the filing of a section 6 notice entails not only compliance with all provisions in the collective bargaining agreements relating to wages, work rules, and working conditions but also the avoidance of any significant, and therefore potentially provocative, change in behavior by the railroad affecting those dimensions of its labor relations. That is the inference one might have drawn from the *Shore Line* decision, had not *Pittsburgh & Lake Erie* described the practice over which the union had wanted to strike in *Shore Line* as "the unquestioned practice for many years, and we considered it reasonable for employees to deem it sufficiently established that it would not be changed without bargaining." 109 S.Ct. at 2594. The practice had, in other words, ripened into a commitment, and thus had become a part of the collective bargaining agreement between the union and the railroad. Practices accompanied by assurances of continuation, express or implied but in either event likely to induce reliance, can create an implied obligation. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2485. A practice that supplies a basis "for implying an understanding," *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2593, that "demonstrates a mutual understanding between the parties," *General Comm. of Adjustment v. CSX Railroad Corp., supra,* 893 F.2d at 591, that is "understood to be the norm," *Brotherhood of Railroad Signalmen v. Burlington Northern R.R.,* 829 F.2d 617, 620 (7th Cir.1987); *Brotherhood of Maintenance Workers v. Burlington Northern R.R.,* 802 F.2d 1016, 1022 (8th Cir.1986), that "constitute[s] a 'course of

dealing' between the carrier and the employees," *Railway Labor Executives' Ass'n v. Norfolk & Western Ry.,* 833 F.2d 700, 705 (7th Cir.1987), or "a mutually acceptable implied working condition within the parties' course of dealing," *id.* at 705, as distinct from a practice that "contradict[s] the express language of a collective bargaining agreement," *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n, supra,* 855 F.2d at 1283; see also *Railway Labor Executives' Ass'n v. Norfolk & Western Ry., supra,* 833 F.2d at 705 n. 4—such a practice is not a mere regularity (and mere regularities are not normative), but "may itself serve as a term of an agreement." *National Railway Labor Conference v. International Ass'n of Machinists,* 830 F.2d 741, 746 (7th Cir.1987). It is, in fact, a binding although unwritten term of the collective bargaining agreement. The "common law of the shop" that comes into play "when there are overlapping contracts, or when a party seeks to disambiguate a contractual provision by reference to the parties' practices, ... is not true common law; it is an interpretive concept. It denotes a methodology for interpreting a written contract." *International Ass'n of Machinists v. General Electric Co.,* 865 F.2d 902, 906 (7th Cir.1989).

With this understanding of "practice," *Shore Line* is seen to be consistent with the proposition that the status quo is defined by the agreement of the parties rather than by the practices, as such, that the railroad happened to have been following on the eve of the section 6 notice. But suppose not, and suppose the C & NW's collective bargaining agreements authorize certain layoffs that the railroad has never made, but it makes them as soon as the section 6 notice is filed. On the view we are now entertaining, the status quo is defined not by the collective bargaining agreements but by the statutes (section 2 Seventh and section 6) themselves. A change in the status quo is on this approach any change in pay, work rules, or working conditions that the collective bargaining agreements do not expressly or

impliedly authorize, even if they do not prohibit the change. In other words it is a change not encompassed by the agreements.

If such a change were designed to disrupt the bargaining process, it would violate the statutory duty to bargain in good faith. § 2 First, 45 U.S.C. § 152 First. If it was innocent and nevertheless would be covered by the status quo provisions, we still do not think there was a change in the status quo in the present case. First, as already explained, a sale of the whole or a part of one's business is not a change in pay, work rules, or working conditions, albeit it may affect them. Second, the practice of abandoning unwanted rail lines under standards established by the Interstate Commerce Commission embraced the practice of selling unwanted rail lines under standards established by the same body.

The second point requires elaboration. Apart from the Commission's shifting policies, abandonments and sales have similar effects on workers. Similar, but not identical—yet the differences are such as to make sales the *more* attractive form of transaction from the workers' standpoint (which is the standpoint that is pertinent in deciding whether the railroad is departing from the status quo). For the workers on a line that is sold may be retained by the new owner. It is true, and for the reason just stated not surprising, that the ICC's rules governing abandonments are much more favorable to the affected workers than the rules governing sales because the former require generous severance pay and the latter require nothing. The difference may reflect the better prospects of the worker under the latter form of transaction. In any event the status quo is not altered every time the ICC changes protective conditions. Such changes in this era of regulatory flux in the railroad industry could be anticipated both by the railroad and by the unions, and the railroad was entitled to take advantage of the changes without having first to pass through the fires of section 6 negotiation and survive a possibly paralyzing strike—especially since the purpose of the latest changes was, in accordance with the congressional man-

date, to free the railroad industry from the dead hand of regulation. If the unions did not want to take their chances with the ICC's largesse, they could—they still can—negotiate for severance pay or other protective conditions for workers affected by abandonments or sales. But they have not persuaded us that every time the ICC alters a protective condition, the next sale or abandonment violates a status quo defined by the previous conditions and can therefore be blocked by filing a section 6 notice.

We have gotten pretty tangled in the arcana of the Railway Labor Act and it may be useful to step back for a moment and survey the scene. We take the essential message of *Pittsburgh & Lake Erie* to be that a railroad which like the C & NW has not in bargaining surrendered its right to sell all *or some* of its assets is free to make such a sale without having to bargain with the unions over the making of the sale itself, and hence *in advance* of the sale. The only bargaining the railroad is required to engage in comes afterward, if the unions want to bargain for additional protection for workers made redundant by the sale.

This leaves for discussion the questions of the minor dispute and the order to arbitrate. The district judge ruled, and in upholding the preliminary injunction we agreed, that the dispute over selling the Duck Creek South line without protective conditions was a minor dispute, that is, a dispute over the interpretation of the collective bargaining agreements, and was therefore subject to compulsory arbitration under section 3 of the Act. This conclusion may seem implicit, moreover, in the preceding analysis in this opinion. And yet the unions are emphatic that there is no dispute over the meaning of the collective bargaining agreements, acknowledging without hesitation or reservation that the agreements permit the sale of the Duck Creek South line without protective conditions. What the agreements do not expressly or impliedly forbid they permit, and they do not forbid line sales or abandonments—all they do is give employees laid off as a result of the sale or abandonment

a right to bump less senior employees of the C & NW. We do not understand the unions to be disputing these propositions, and specifically we do not understand them to be contending that, somehow apart from the collective bargaining agreements, there is an arbitrable issue of the railroad's right to make the sale without protective conditions. The unions think they have a major dispute with the railroad, not a minor, and therefore arbitrable, dispute. And it is the railroad that sought the order to arbitrate.

If there is no dispute over the meaning of the collective bargaining agreements, what is there to arbitrate? Nothing, says the railroad, although all it asks for in its cross-appeal is that we modify the terms of reference so that the arbitrators are asked only to decide whether the agreements have been violated. However, the unions' concession that the agreements have not been violated eliminates any arbitrable issue and therefore requires us, if we accept the railroad's position, to vacate the district court's order to arbitrate as moot; there is nothing to arbitrate. The question of the proper disposition of the cross-appeal came up at oral argument, and in a supplemental brief the railroad has reconsidered and asked us to dismiss the cross-appeal as moot. It is indifferent to how the question for arbitration is framed, because after the unions' concessions there will be no arbitration.

The task of arbitrators under the Railway Labor Act—the task, for that matter, of almost all arbitrations—is contractual interpretation. *Lancaster v. Norfolk & Western Ry., supra,* 773 F.2d at 814. If there is no dispute over the meaning of a contract, there is nothing for them to do. Either the district judge disagreed, or, more likely, the unions had not made their position clear to him or have since changed their position; in any event he thought that "attendant past practices" might be a source of obligation to workers laid off as a result of the Duck Creek South sale, as well as the collective bargaining agreements themselves. If the unions ever took this position in this litigation, they no longer do. As we have been at pains to emphasize in this opinion, practices by themselves do not obligate the practitioner to continue. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2593. But when practices *are* normative—when they create implied obligations under the collective bargaining agreements—their interpretation falls under the sway of section 3 too. For there is no general requirement that a collective bargaining agreement, as distinct from agreements concerning dues and pension rights, be in writing. *Merk v. Jewel Food Stores,* 734 F.Supp. 330, 333 (N.D.Ill. 1990), and cases cited there. The contrary statement in *Shipley v. Pittsburgh & Lake Erie R.R.,* 83 F.Supp. 722, 741 (W.D.Pa. 1949), is flat wrong. There could not be such a requirement, because then implied obligations derived from practices would not be enforceable, and they are enforceable; "either express or implied contractual terms, as interpreted through established past practice, will serve to classify a dispute as minor." *General Comm. of Adjustment v. CSX Railroad Corp., supra,* 893 F.2d at 592. Such an obligation is therefore actionable under section 3 of the Railway Labor Act. But the unions do not argue that the practice of the railroad in complying with the ICC's requirements for protective conditions in railroad abandonments created an implied obligation to impose those conditions on any line sale it might make, irrespective of ICC requirements or lack thereof. As stated in the unions' brief in response to the cross-appeal, "rail labor agrees that such similar treatment would be just and fair in this case, but appellants must reluctantly admit that the adjustment boards [the section 3 arbitral bodies] cannot enforce those benefits here," because the benefits are not expressly or impliedly contractual.

To repeat, the unions never wanted arbitration in this case—their position being that this is a major dispute—and they are not defending the order to arbitrate, even though the terms of reference are favorable to them. The railroad doesn't like those terms of reference; but no matter; the unions admit that the order itself has no legal basis. They not only admit it, they

trumpet it, because they think it supports their position that their dispute with the railroad is major, not minor. Well, what about a third possibility—that there is neither a major nor a minor dispute over the sale of the Duck Creek South line? Consideration of this possibility will enable us to draw our analysis to a close.

■■■■ The panel of this court that upheld the preliminary injunction against the unions' striking did so on the ground that it was necessary to protect the exclusive jurisdiction of the arbitrators to resolve minor disputes—exclusive not only of the courts, but of the self-help remedies of the parties. 855 F.2d at 1287. If there is no longer a minor dispute, can the injunction be sustained? And made permanent—forbidding a strike over the sale of the Duck Creek South line forever, even though the arbitration proceeding with which the strike might have interfered is never to take place? The answers are yes.

Insofar as the unions are seeking through their section 6 notice to alter the collective bargaining agreements to require severance pay for workers hurt by line sales, including the workers who lost their jobs in the Duck Creek South sale, section 6 itself forbids the unions to strike until the procedures for peaceful settlement established in that section are exhausted, and they have not been; the matter is in mediation right now. Insofar as the unions want to strike merely to protest a transaction that (as we have seen) does not violate any of their statutory or contractual entitlement, they are using an unauthorized self-help remedy, which violates the Act and is therefore enjoinable. *General Comm. of Adjustment v. CSX Railroad Corp., supra,* 893 F.2d at 586, 595. For with immaterial exceptions illustrated by *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), injunctions to enforce the Railway Labor Act do not violate the Norris–LaGuardia Act. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, supra,* 109 S.Ct. at 2598–99; *General Comm. of Adjustment v. CSX Railroad Corp., supra,* 893 F.2d at 595. And if a party to a collective bargaining agreement may not strike to

enforce its view of its rights under the agreement, all the more clearly may it not strike to enforce rights that it concedes the agreement does not give it. It may strike to change the agreement once all peaceable means of dispute resolution have been exhausted, but it is bound by the agreement until the agreement is changed. The policy behind the compulsory-arbitration provisions of the Railway Labor Act is to prevent strikes over matters regulated by a binding collective bargaining agreement. The strike that the unions want to conduct in this case in protest against the railroad's exercising rights that it enjoys by virtue of the collective bargaining agreements would flout that policy.

■■■■ This principle is obscured by the fact that the C & NW is neither relying upon a particular provision in a collective bargaining agreement for the authority to sell lines nor asking, in fact, that the dispute over the sale of the Duck Creek South line be submitted to arbitration to vindicate its contractual rights. This makes it seem as if we have neither a major nor a minor dispute. But this is untrue and in fact the major-minor classification is exhaustive of all possible labor disputes in the railway industry, as we noted in *Brotherhood of Railroad Signalmen v. Burlington Northern R.R., supra,* 829 F.2d at 619. When the C & NW made the sale, it did so on the authority of the collective bargaining agreements, which by not forbidding a transaction otherwise within management's prerogatives permitted it. If the unions disagreed with the C & NW's interpretation of its contractual rights, their only lawful recourse was an arbitration proceeding under section 3, because a disagreement over what a collective bargaining agreement permits or forbids is a minor dispute. Once a minor dispute, always a minor dispute, at least in the sense that the union cannot convert a minor dispute into a major dispute by conceding that no arbitration is necessary because the railroad's interpretation of the agreement is correct after all. In that case, all the union can do is to try to change the agreement for the future, by filing a section 6 notice, thereby precipitating a major dispute. It cannot break the contract and call the resulting

dispute major, entitling it to strike; a dispute is still a minor dispute after one of the disputants has thrown in the towel. Filing a section 6 notice may kick off a major dispute; it does not transform a minor dispute into a major one. *General Comm. of Adjustment v. CSX Railroad Corp.*, *supra*, 893 F.2d at 594; *CSX Transportation, Inc. v. United Transportation Union*, 879 F.2d 990, 1000–01 (2d Cir.1989). Otherwise Congress's desire to confine contract disputes to compulsory arbitration would be thwarted.

We need not decide whether the permanent injunction would have been proper had the parties gone to arbitration and the unions won. For then if the railroad refused to comply with the arbitrators' award, thus thumbing its nose at compulsory arbitration, there would be an argument that the union should have a right to strike in protest. How strong an argument, in view of the amplitude of the Railway Labor Act's judicial remedies for disobeying an arbitration award, 45 U.S.C. § 153 First (p), (q), we need not decide. Our hypothetical case cannot arise in this litigation because the parties are agreed that there is nothing to arbitrate.

A dispute can, as we have emphasized, be a minor dispute subject to the exclusive jurisdiction of the arbitral bodies set up under the Railway Labor Act even if one of the disputants has given up. And abandonment of an unlawful practice ordinarily does not moot proceedings to bring the violator to book (which is one reason you can have a dispute without a present disagreement). *NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567, 70 S.Ct. 826, 828, 94 L.Ed. 1067 (1950); *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 890 (7th Cir.1990). The railroad would still be entitled to a suitable order by the arbitrator. But as the railroad does not want arbitration—and neither does the union—no purpose would be served by ordering arbitration, although, to repeat, the dissolution of the order to arbitrate does not signify that the dispute is not a minor one. It is a minor one.

Not only would no purpose be served by ordering arbitration, but there is a considerable question, though again one not necessary to decide, concerning the district court's power to order arbitration. The Act does not confer such a power, and we are unclear what purpose would be served by interpolating one. Either party to a collective bargaining agreement can invoke the arbitral process, 45 U.S.C. § 153 First (i), which will then proceed to an award enforceable in district court under sections First (p) or (q), whether or not the other party cooperates; there can be a default in arbitration just as there can be a default in adjudication. There is no need for a party to run to the court first for an order to arbitrate, and we are given no explanation for why the railroad followed that procedure here.

The district court's grant to the C & NW of a permanent injunction against the unions' striking over the Duck Creek South sale, and the denial of the unions' request for a bargaining order and an injunction against a change in the status quo, are affirmed, except that we shall remand the case to permit the district court to modify the injunction to comply fully with Rules 58 and 65(d). The cross-appeal is dismissed with directions to the district court to vacate its order to arbitrate as moot. There will be no award of costs in this court.