George N. SABICH, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, a national railroad corporation, Defendant.

No. 90 C 3344.

United States District Court,
N.D. Illinois, E.D.

May 20, 1991.

Robert B. Thompson, Henslee, Monek & Henslee, Chicago, Ill., appeared on behalf of the plaintiff.

Joanna Moorhead, Deputy General Counsel by Jonathan Saperstein, Associate General Counsel, National R.R. Passenger Corp., Washington, D.C., Manuel Sanchez, Sandra A. Yamate, Sanchez & Daniels, Chicago, Ill., appeared on behalf of the defendant.

## MEMORANDUM ORDER

BUA, District Judge.

This dispute presents a thorny issue of federal preemption in the railroad labor context. Plaintiff, a railroad employee, has asserted a retaliatory discharge claim against his employer. The employer, a national railroad, contends that plaintiff's claim is preempted by the exclusive arbitral provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Based on this contention, defendant has filed a motion for summary judgment. As an alternative basis for summary judgment, defendant argues that plaintiff's claim is deficient under state law. This court is unpersuaded by defendant's preemption argument, but nonetheless finds merit in defendant's alternative argument. Accordingly, defendant's motion for summary judgment is granted.

## I. FACTS

Defendant National Railroad Passenger Corporation, also known as "Amtrak", is a common carrier subject to the provisions of the RLA. In 1983, Amtrak hired plaintiff George N. Sabich as an on-board train attendant. Six years later, Sabich became an Assistant Passenger Conductor. The terms and conditions of Sabich's new position were governed by a collective bargaining agreement between Amtrak and the United Transportation Union. Under the agreement, new conductors are subject to a 90–day probationary period. If the employee does not meet with disapproval during the probationary period, his application is considered approved.

On December 29, 1989, during his probationary period, Sabich was injured in a train derailment. Pursuant to Amtrak policy, Sabich reported the injury to his supervisor. (Amtrak obligates its employees to submit injury reports to ensure proper treatment and evaluation of all on-the-job injuries.) Following the investigation of the incident, Amtrak determined that Sabich had violated several company safety rules, which led to his injury.

On January 4, 1990, Amtrak disapproved Sabich's application for the assistant conductor position. According to Amtrak, it did not approve Sabich's application because of his poor safety record. Sabich, on the other hand, claims that he lost his job simply because he reported his injury to Amtrak.

Challenging Amtrak's employment decision, Sabich filed suit in state court. Amtrak subsequently removed the lawsuit to federal court. Electing not to contest the removal, Sabich filed an amended complaint asserting diversity jurisdiction. Sabich also alleges that this lawsuit presents a federal question based on Federal Railroad Administration regulations that re-

quire railroads to submit monthly accident reports. *See* 49 C.F.R. § 225.

## II. DISCUSSION

Sabich's complaint asserts a single claim for retaliatory discharge. Sabich contends that he was discharged in retaliation for submitting his injury report to Amtrak.

Amtrak now moves for summary judgment. In support of its motion for summary judgment, Amtrak raises two arguments. First, Amtrak argues that Sabich's cause of action is preempted by the RLA. Second, Amtrak contends that even if Sabich's claim is not preempted, his allegations are insufficient under state law. The court will address each argument in turn.

### A. Federal Law—Preemption

■■■ Congress enacted the RLA to promote stability in labor/management relations within the railroad industry. *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978). In furtherance of this goal, the RLA provides for mandatory grievance procedures to resolve certain labor disputes, commonly referred to as "minor" disputes. Minor disputes stem from the interpretation or application of an existing collective bargaining agreement. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989).[1] When a minor dispute arises, labor and management must submit to binding arbitration before the National Railroad Adjustment Board (or an adjustment board established by the parties). 45 U.S.C. § 153. The National Railroad Adjustment Board, in fact, has exclusive jurisdiction over minor disputes, subject only to limited judicial review. *Consolidated Rail*, 109 S.Ct. at 2481.

■■ Amtrak takes the position that this case presents the type of dispute that falls within the exclusive jurisdiction of the Adjustment Board—as such, it is preempted by the RLA. However, Amtrak does not only argue that this case is essentially a minor dispute within the exclusive province of the arbitral boards. Amtrak takes its argument one step further by suggesting that the RLA is so pervasive in railroad labor relations that it preempts not only claims dependent upon an interpretation of the collective bargaining agreement, but "any state tort claim arising out of an employment-related dispute." *Reply Memorandum,* at 11. Amtrak's argument goes too far. In this court's view, the RLA does not embody the all-encompassing preemptive power that Amtrak attributes to it.

Unfortunately, it appears that the developing body of case law in this area is in "disarray". *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045, 1061 (7th Cir.1983) (Posner, J., concurring in part and dissenting in part). And the Supreme Court has yet to address the scope of RLA preemption with respect to state law tort claims. Thus, the underlying objectives of the RLA provide the focal point for assessing Amtrak's argument. The general purposes behind the legislation are:

(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employment to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) *to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions;* (5) *to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agree-*

---

**1.** "Minor" disputes, which involve the enforcement of contractual rights, are distinguished from "major" disputes, which arise from the formation or change of a collective bargaining agreement. *Consolidated Rail,* 109 S.Ct. at 2480. The appellations given to these disputes do not imply that the issues involved are major or minor in the ordinary sense; they are simply terms of art used by courts in RLA cases. *Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 148 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

*ments covering rates of pay, rules, or working conditions.*

45 U.S.C. § 151a (emphasis added). As can be seen from this provision, the RLA is concerned primarily with avoiding interruptions in rail activity while maintaining equal bargaining power between labor and management. *See Burlington N.R.R. v. United Transp. Union,* 862 F.2d 1266, 1271 (7th Cir.1988). The RLA does not concern itself with every conceivable issue that arises in the employment setting; at the heart of the disputes described in § 151a is the collective bargaining agreement.

Amtrak does not point to any provision in the RLA which gives arbitrators exclusive jurisdiction over claims that are wholly independent of collective bargaining. "Granted, the Railway Labor Act defines the arbitrators' domain as employment disputes 'growing out of grievances *or* out of the interpretation or application of [collective bargaining] agreements,' which seems to say that more than contract interpretation is covered." *Lancaster v. Norfolk and W. Ry.,* 773 F.2d 807, 814 (7th Cir. 1985) (quoting 45 U.S.C. § 153 First (i)). Nonetheless, as Judge Posner pointed out in *Lancaster,* this language is redundant because a grievance is nothing more than a claim that the collective bargaining agreement has been violated. *Id.; see also Jackson,* 717 F.2d at 1059 (Posner, J., concurring in part and dissenting in part).

Amtrak's contention that all employment-related tort actions are within the domain of the arbitrator is unconvincing. The role of the arbitrator, whether it be in labor or commercial disputes, is to interpret contracts. *Lancaster,* 773 F.2d at 814. Congress, in its infinite wisdom, could not have intended that matters within the particular competence of the courts (*i.e.,* tort law) should be uniformly relegated to arbitrators versed in contract interpretation. The whole point of creating an exclusive arbitration board is to allow for the expedi-

tious and uniform interpretation of employment contracts by an administrative body possessing expertise in interpreting such contracts. "The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions." *Sheehan,* 439 U.S. at 94, 99 S.Ct. at 402. It is these "minor" disputes that Congress intended to keep within the realm of arbitration, and out of the courts. *Id.*

Federal labor policy is not implicated every time a tort is committed during employment. Submitting all employment-related tort claims to arbitrators does nothing to further the goals of the RLA. "In enacting [the RLA], Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes *arising out of the interpretation of collective-bargaining agreements.*" *Id.* (emphasis added); *see also Slocum v. Delaware, L. & W. R.R.,* 339 U.S. 239, 243, 70 S.Ct. 577, 579, 94 L.Ed. 795 (1950) ("The [RLA] ... represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes *growing out of the interpretation of existing agreements.*") (Emphasis added.) A court will not unduly encroach upon the federal regulatory interest embodied in the RLA if the resolution of the particular dispute does not touch upon the employee's terms of employment or contractual rights. In keeping with the purposes and history of the RLA, this court concludes that the RLA only preempts those claims that are dependent upon an examination of the parties' contractual rights and obligations, and not all tort claims incidentally related to employment.[2]

---

2. Other courts have indicated that the RLA only preempts claims that stem from an interpretation or application of the collective bargaining agreement. *See, e.g., Beard v. Carrollton R.R.,* 893 F.2d 117, 122 (6th Cir.1989); *Edelman v.*

*Western Airlines, Inc.,* 892 F.2d 839, 843–44 (9th Cir.1989); *Alfieri v. CSX Corp.,* 201 Ill.App.3d 559, 569, 147 Ill.Dec. 166, 173, 559 N.E.2d 166, 173 (1990) (retaliatory discharge claim not preempted by the RLA).

■ The question, then, is whether Sabich's retaliatory discharge claim depends on an interpretation of the collective bargaining agreement (and is therefore subject to compulsory arbitration). To state a claim for retaliatory discharge, Sabich must demonstrate "that he was dismissed in retaliation for his activities, and that the dismissal was in contravention of a clearly mandated public policy." *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 654, 568 N.E.2d 870, 875 (1991). The relevant issues—specifically, the reason for the discharge and whether the reason violates public policy—only relate to the employee's conduct and the employer's motive for the discharge. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 1882, 100 L.Ed.2d 410 (1988); *Alfieri v. CSX Corp.*, 201 Ill.App.3d 559, 569, 147 Ill.Dec. 166, 173, 559 N.E.2d 166, 173 (1990). The Supreme Court, in *Lingle*, recognized that neither of these issues "requires a court to interpret any term of a collective-bargaining agreement." 108 S.Ct. at 1882. Likewise, the issue relevant to the defense of such a claim—whether the discharge was nonretaliatory in nature—presents a "purely factual inquiry [that] does not turn on the meaning of any provision of a collective-bargaining agreement." *Id.* Insofar as a retaliatory discharge claim does not rest on a construction of the collective bargaining agreement, it is independent of the agreement. *Id.; see also Koehler v. Illinois Cent. Gulf R.R.*, 109 Ill.2d 473, 483, 488 N.E.2d 542, 547 (1985) (Simon, J., dissenting) ("[r]etaliatory discharge is a law of State rights and obligations existing 'independently of private agreements'"). Since Sabich's retaliatory discharge claim is independent of the collective bargaining agreement, it is not preempted by the RLA.

Amtrak cites several cases (most notably, *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045 (7th Cir.1983)) which stand for the proposition that a retaliatory discharge claim does in fact depend upon an interpretation of the collective bargaining agreement. It is sufficient to note that these cases were decided before the *Lingle* decision, wherein the Supreme Court rejected this line of reasoning. *See Merchant v. American S.S. Co.*, 860 F.2d 204, 208 (6th Cir.1988).[3]

---

Interestingly enough, the United States Supreme Court dismissed an appeal from a case in which a state court held that the RLA did not preempt a retaliatory discharge claim. In *Puchert v. Agsalud*, 67 Haw. 25, 677 P.2d 449, 454–56 (1984), the Hawaiian Supreme Court held that the RLA did not preempt a state statute that prohibited discharging an employee in retaliation for filing a workers' compensation claim. The United States Supreme Court dismissed the appeal for want of a substantial federal question. *Pan Am. World Airways, Inc. v. Puchert*, 472 U.S. 1001, 105 S.Ct. 2693, 86 L.Ed.2d 710 (1985). A federal court of appeals has concluded that the Supreme Court's disposition of the *Puchert* case is significant: "If the Hawaii law were preempted by the RLA, the case would necessarily have presented the Court with a substantial federal question." *Baldracchi v. Pratt & Whitney Aircraft Div.*, 814 F.2d 102, 106 (2d Cir.1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2819, 100 L.Ed.2d 920 (1988).

3. Amtrak contends that *Lingle* is inapplicable because that case involved preemption under the Labor Management Relations Act ("LMRA") rather than the RLA. In Amtrak's opinion, LMRA preemption is not as comprehensive as RLA preemption and, therefore, LMRA cases provide little or no guidance in interpreting the RLA. Amtrak relies heavily on a recent case decided by the Illinois Supreme Court, *Gendron*

*v. Chicago & N.W. Transp. Co.*, 139 Ill.2d 422, 151 Ill.Dec. 545, 564 N.E.2d 1207 (1990). But that case provides little support for Amtrak's position. In *Gendron*, the court merely held that the RLA preempted the plaintiffs' fraudulent conveyance and civil conspiracy claims—claims which, under Illinois law, necessitated an interpretation of the collective bargaining agreement. *Gendron* simply did not reach the issue of whether *Lingle* is applicable to the RLA because the court concluded that "[e]ven under the preemption test annunciated in *Lingle*, ... plaintiffs' claims here are preempted by the RLA." *Id.* at 436, 564 N.E.2d at 1214.

While this court agrees with Judge Posner that there may not be much to the argument that the RLA has greater preemptive force than the LMRA (see *Lancaster*, 773 F.2d at 816–17), the issue does not have to be broached for purposes of this case. The court is not relying on *Lingle* to determine the scope of RLA preemption; that can be found by looking at the language and purposes of the RLA itself. The court is merely relying on *Lingle* to show that a retaliatory discharge claim is not dependent on the meaning of the collective bargaining agreement. (Incidentally, before *Lingle* reached the Supreme Court, the Seventh Circuit stated that "we have previously held that the [National Labor Relations Act], including § 301 of the

Having determined that Sabich's claim is not preempted by federal law, the court will proceed to Amtrak's next argument—namely, that Sabich has failed to state a claim under Illinois law.[4]

## B. Illinois Law

■ Amtrak argues that even if the RLA does not preempt Sabich's cause of action, Sabich is unable to establish the elements necessary to maintain a retaliatory discharge claim. As noted earlier, Sabich must essentially satisfy two elements: 1) that he was discharged in retaliation for his conduct; and 2) that the discharge violated a clearly mandated public policy. *Fellhauer*, 154 Ill.Dec. at 654, 568 N.E.2d at 875. Sabich's claim, as with most retaliatory discharge claims, hinges on the second element: whether he was discharged in contravention of a "clearly mandated public policy".

The Illinois Supreme Court defines public policy as follows:

In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions.... [A] matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

*Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 130, 52 Ill.Dec. 13, 15–16, 421 N.E.2d 876, 878–79 (1981) (citation omitted). Admittedly, this definition is not precise; what constitutes a clearly mandated public policy is not always clear.

Although the public policy element may be difficult to pin down, one thing is certain: the Illinois Supreme Court does not endorse a broad construction of the tort of retaliatory discharge. *Fellhauer*, 154 Ill. Dec. at 654, 568 N.E.2d at 875 (retaliatory discharge is a "limited and narrow cause of action"); *see also Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 525, 88 Ill.Dec. 628, 630, 478 N.E.2d 1354, 1356 (1985). Since 1978, when the supreme court first recognized a cause of action for retaliatory discharge (*Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353), Illinois courts have remained steadfast in their refusal to expand the scope of the tort. *Lambert v. City of Lake Forest*, 186 Ill.App.3d 937, 941, 134 Ill.Dec. 709, 712, 542 N.E.2d 1216, 1219 (1989).[5] This court, in applying Illinois law, must follow the same course.

The allegations set forth in Sabich's complaint do not fit within the narrow confines of a valid retaliatory discharge claim. Assuming that Amtrak discharged Sabich because he submitted an injury report, there are no policy concerns that are implicated by the discharge. Sabich does not cite any Illinois statute or judicial decision to support his claim that he was discharged in violation of public policy. The cases in which Illinois courts have recognized the tort are not even remotely analogous to this case. *See id.* at 941–43, 134 Ill.Dec. at 712–13, 542 N.E.2d at 1219–20 (collecting cases).

This matter certainly does not affect the citizens of Illinois collectively. Sabich was

---

LMRA, has the same preemptive effect as the RLA." *Lingle v. Norge Div. of Magic Chef, Inc.*, 823 F.2d 1031, 1045 (7th Cir.1987) (citing *Lancaster*, 773 F.2d at 816–17).)

**4.** In its initial brief, Amtrak argues at some length that Sabich's claim cannot survive summary judgment because the RLA does not create a private cause of action for retaliatory discharge. This argument misses the mark. Sabich does not assert that his cause of action is created or recognized by federal legislation. He is asserting a tort claim founded solely upon state law. Since the tort of retaliatory discharge derives from the law of Illinois, Sabich does not have to demonstrate that the RLA creates an

express or implied right of action. His cause of action is evaluated according to Illinois law.

**5.** For the most part, Illinois courts have allowed retaliatory discharge actions in only two settings: 1) when an employee is discharged in retaliation for asserting his rights under the Workers' Compensation Act, Ill.Rev.Stat. ch. 48, para. 138.1 *et seq.;* and 2) when an employee is discharged in retaliation for reporting illegal or otherwise unauthorized behavior (in informal terms, "whistle blowing"). *Layne v. Builders Plumbing Supply Co.*, 210 Ill.App.3d 966, ——, 155 Ill.Dec. 493, 499, 569 N.E.2d 1104, 1110 (1991); *Lambert*, 186 Ill.App.3d at 941–42, 134 Ill.Dec. at 712, 542 N.E.2d at 1219.

not compelled by state or federal law to report his injuries; the reporting requirements were created by Amtrak in furtherance of company policy.[6] The court agrees with Amtrak that the filing of an injury report pursuant to company policy does not "strike at the heart of a citizen's social rights, duties, and responsibilities." There is no particular societal interest in seeing that all injuries sustained in the railroad employment setting are reported to supervisory personnel. It is true that railroads have an obligation to report certain accidents to federal regulators, 49 C.F.R. § 225; but this obligation certainly does not provide the foundation for Illinois public policy. This court, moreover, sees no basis for inferring Illinois policy from the federal railroad regulations involved in this case.

Quite simply, Sabich has failed to show that his claim derives from a clear expression of public policy. Absent such a showing, Sabich cannot maintain a cause of action for retaliatory discharge.

## III. CONCLUSION

For the foregoing reasons, the court finds that Sabich's retaliatory discharge claim is not preempted by the Railway Labor Act. Nonetheless, Sabich cannot state a claim for retaliatory discharge under Illinois law. The court, therefore, grants Amtrak's motion for summary judgment.

IT IS SO ORDERED.

---

**6.** According to the uncontroverted declaration of Amtrak's Director of Safety, the reporting rule is solely a matter of internal company policy; it is not promulgated pursuant to federal regulations. Indeed, while Amtrak requires its employees to report any on-the-job injury (no matter how small), not every injury that occurs during daily operations must be reported to federal regulators. Approximately one-half of all injuries occurring during the course of operations do not even meet the criteria for reporting accidents to the government. *Declaration of Mark D. Meana,* ¶ 2. At any rate, there is no evidence that Amtrak needed Sabich's report to comply with its own federal reporting obligations.