(No. 69582.—

T.J. GENDRON, Indiv. and on Behalf of All Others Similarly Situated, *et al.*, Appellants, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY *et al.*, Appellees.

*Opinion filed November 30, 1990.*

Timothy D. Kelly and Lee F. Arnold, of Kelly & Berens, of Minneapolis, Minnesota, and Steven A. Weiss, and Arthur J. Howe, of Schopf & Weiss, of Chicago, for appellants.

Harold C. Hirshman, Jeffrey L. Dorman, William M. Walsh and Edward T. Perelmuter, of Sonnenschein, Nath & Rosenthal, and James P. Daley, Stuart F. Gassner and Myles L. Tobin, all of Chicago, for appellee Chicago & North Western Transportation Co.

Susan Getzendanner, of Skadden, Arps, Slate, Meagher & Flom, of Chicago, for appellee Fox River Valley Railroad Corp.

JUSTICE RYAN delivered the opinion of the court:

Plaintiffs, the Railway Labor Executives' Association (RLEA) and certain employees of defendant, Chicago & North Western Transportation Company (C & NW), sued in the circuit court of Cook County seeking to enjoin an allegedly fraudulent conveyance of a portion of the rail line of C & NW to defendant Fox River Valley Railroad Corporation (FRVR) and for damages allegedly occasioned by that conveyance. The circuit court dismissed plaintiffs' complaint on the ground that plaintiffs' State-law claims are preempted by the Federal Railway Labor Act (45 U.S.C. §§151 through 188 (1982)) (RLA) and the Interstate Commerce Act (49 U.S.C. §§10101 through 11917 (1982)) (ICA). The appellate court affirmed, with one justice dissenting. (190 Ill. App. 3d 301.) We granted plaintiffs' petition for leave to appeal (107 Ill. 2d R. 315), and now affirm the decision of the appellate court.

Plaintiff T.J. Gendron is an employee of C & NW. He alleges that he is also a creditor of C & NW. Plaintiff RLEA is a voluntary, unincorporated association of the chief executive officers of the standard national and international railway unions in the United States. RLEA also alleges that it is a creditor of C & NW.

Defendant C & NW is the nation's ninth largest rail system. Defendant FRVR was incorporated under the laws of Wisconsin in September 1987. In late 1987, C &

NW and FRVR began negotiating the sale of 208 miles of Wisconsin rail line and incidental trackage rights from C & NW to FRVR. This rail line is known as the Duck Creek South Line.

The line sale was consummated in 1988, and took the form of a "leveraged buy out"; FRVR borrowed funds to purchase C & NW assets and will use the purchased assets as collateral to secure the borrowed funds. C & NW is to receive $61.1 million from the sale and will continue to operate as a Class I railroad.

On December 23, 1987, C & NW and FRVR (the railroads) filed with the Interstate Commerce Commission (ICC) a notice of exemption from regulation, seeking approval of the sale and requesting clarification of the ICC's jurisdiction over labor issues arising from line sale transactions. Under the procedures established in *Ex parte No. 392* (1985), 1 I.C.C.2d 810, the ICC's authorization of the sale became effective on December 30, 1987. (The Staggers Rail Act of 1980 (49 U.S.C. §10505(a) (1982)) authorized the ICC to exempt from regulation a broad range of rail-related transactions deemed to be of limited scope (49 U.S.C. §10505(a) (1982)).) Pursuant to this authority, in *Ex parte No. 392* (1985), 1 I.C.C.2d 810, *aff'd sub nom. Illinois Commerce Comm'n v. Interstate Commerce Comm'n* (D.C. Cir. 1987), 817 F.2d 145, the ICC established a policy whereby a short rail line sale to a noncarrier, like FRVR, would be approved automatically seven days after the filing with the ICC of an application for exemption from regulation. As part of the policy established in *Ex parte No. 392*, the ICC announced that it would not, as a matter of course, impose "labor protective conditions" on such short-line sales. Such conditions, including pay and benefit protection for employees, were formerly imposed by the ICC as part of its approval of rail line sales. Following the ICC's authorization of a sale, a la-

bor union may seek labor protection, or otherwise challenge the sale, by filing a petition to revoke the exemption pursuant to 49 U.S.C. section 10505(d). (*Ex parte No. 392*, 1 I.C.C.2d at 815. See also *Chicago & North Western Transportation Co. v. Ry. Labor Executives' Association* (7th Cir. 1988), 855 F.2d 1277, 1279.) On January 29, 1988, the ICC responded to the railroads' request for clarification, expressing its view that it continued to have jurisdiction over rail line sales to the extent necessary to allow the parties to a sale to consummate a transaction previously authorized by the ICC. On February 19, 1988, the RLEA petitioned the ICC for revocation of the exemption from regulation. The ICC subsequently denied the RLEA's petition.

Plaintiffs initiated the present class action on January 22, 1988, by filing a three-count complaint in the circuit court of Cook County. The complaint alleges that the sale of the Duck Creek South Line constitutes a fraudulent conveyance under Illinois law (Ill. Rev. Stat. 1987, ch. 59, par. 4), and is the product of a civil conspiracy between the railroads to deprive plaintiffs of their rights and benefits as creditors of C & NW. In their complaint plaintiffs seek to enjoin the sale or to create a lien on the Duck Creek South Line, other injunctive relief and damages allegedly occasioned by the sale.

Plaintiffs allege in their complaint that C & NW's purpose in selling the Duck Creek South Line is to avoid the cost burden of ownership, including continuing to pay plaintiffs' wages and benefits. Plaintiffs claim that the sale is a highly leveraged buyout and that C & NW will use the proceeds of the sale to pay favored creditors or to pay dividends or other benefits to C & NW's shareholders rather than satisfying plaintiffs' claims. Plaintiffs further allege that FRVR will be left dangerously undercapitalized, with the bulk of its assets pledged as security for the benefit of creditors other than plaintiffs.

On February 1, 1988, the railroads filed a petition for removal to Federal court pursuant to 28 U.S.C. sections 1441 and 1446, and the case was accordingly removed. Plaintiffs filed in the Federal district court a motion to remand, and the railroads filed a joint motion to dismiss plaintiffs' complaint on the ground that plaintiffs' causes of action are preempted by the RLA and the ICA. The Federal court remanded the case to State court, holding that neither the RLA nor the ICA are "complete preemption" statutes; a preemption defense under these statutes is insufficient to confer removal jurisdiction on Federal courts. (See *Caterpillar Inc. v. Williams* (1987), 482 U.S. 386, 96 L. Ed. 2d 318, 107 S. Ct. 2425 (discussing the "complete preemption" doctrine).) Having determined that it lacked jurisdiction over this case, the Federal court accordingly declined to pass on the question whether plaintiffs' particular claims are preempted by the RLA and/or the ICA.

Upon remand to the circuit court of Cook County, the railroads again filed a motion to dismiss the complaint. The circuit court granted the motion, ruling that plaintiffs' causes of action are preempted by the RLA and the ICA. Following affirmance by the appellate court (190 Ill. App. 3d 301), plaintiffs appealed to this court. We need only decide whether plaintiffs' causes of action under the Illinois Fraudulent Conveyance Act (Ill. Rev. Stat. 1987, ch. 59, par. 4), since repealed and replaced by the Uniform Fraudulent Transfer Act (Ill. Rev. Stat. 1989, ch. 59, pars. 101 through 112), and for civil conspiracy are preempted by Federal law. We hold that they are, and, as noted above, we accordingly affirm the dismissal of plaintiffs' complaint.

The parties' contentions before this court may be briefly outlined as follows. Plaintiffs assert that the appellate court erred in finding that the plaintiffs' fraudulent conveyance action is a "minor dispute" within the

meaning of the RLA and, therefore, subject to the exclusive jurisdiction of the National Railway Adjustment Board (NRAB). The railroads respond that plaintiffs' claims in fact constitute a "minor dispute" within the RLA, and are thus preempted by that statute. Plaintiffs further argue that their claims are not preempted by the ICA because the relief plaintiffs seek would not conflict with any order of the ICC. The railroads counter by noting that the ICC expressly approved this line sale. The railroads contend that the granting of plaintiffs' requested relief would impermissibly interfere with the ICC's approval and would constitute an undue interference with the ICC's exclusive jurisdiction over these types of railroad line sales. We consider first the arguments concerning the RLA.

Congress enacted the Railway Labor Act to promote stability in labor-management relations in the railroad industry. (*Union Pacific R.R. Co. v. Sheehan* (1978), 439 U.S. 89, 94, 58 L. Ed. 2d 354, 359, 99 S. Ct. 399, 402.) The "general purposes" section of the RLA, in part, states that "[t]he purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; *** (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." (45 U.S.C. §151a (1982).) We note parenthetically that the RLA also covers the airline industry. See 45 U.S.C. §181 *et seq.* (1982).

Labor disputes subject to the dispute-resolution processes of the RLA are characterized as either "major disputes" or "minor disputes." The terms "major" and "minor" do not appear in the RLA but are terms articulated by the Supreme Court to differentiate the two

types of disputes governed by the RLA. These two types of disputes have different avenues of resolution under the RLA. Major disputes relate to the "formation or modification" of a collective-bargaining agreement; they seek to create contractual rights. Minor disputes, on the other hand, involve the interpretation or application of an existing collective-bargaining agreement; minor disputes seek to enforce existing rights. *Consolidated Rail Corp. v. Ry. Labor Executives' Association* (1989), 491 U.S. 299, 302-04, 105 L. Ed. 2d 250, 260-62, 109 S. Ct. 2477, 2479-81; *Elgin, Joliet & Eastern Ry. Co. v. Burley* (1945), 325 U.S. 711, 723, 89 L. Ed. 1886, 1894, 65 S. Ct. 1282, 1289-90.

The category of minor disputes, into which the railroads assert plaintiffs' present claims fall, is based on section 2 Sixth and section 3 First (i) of the RLA. (45 U.S.C. §§152 Sixth, 153 First (i) (1982); see *Consolidated Rail Corp.*, 491 U.S. at 302, 105 L. Ed. 2d at 261, 109 S. Ct. at 2480.) These sections set forth conference and arbitration procedures for disputes arising or growing "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." The Supreme Court has recognized that the category of "minor disputes":

> "contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future." *Elgin, Joliet & Eastern Ry.*

*Co. v. Burley* (1945), 325 U.S. 711, 723, 89 L. Ed. 1886, 1894, 65 S. Ct. 1282, 1290.

See also *Consolidated Rail Corp. v. Ry. Labor Executives' Association* (1989), 491 U.S. 299, 303, 105 L. Ed. 2d 250, 261-62, 109 S. Ct. 2477, 2480-81.

Under the minor-dispute mechanism of the RLA, the parties themselves are to resolve the dispute in the first instance. If the parties are unsuccessful, then the dispute is subject to compulsory and binding arbitration before the National Railroad Adjustment Board (45 U.S.C. §153 First (1982)), or before an adjustment board established by the employer and the unions representing the employees. (45 U.S.C. §153 Second (1982).) In either case the RLA vests in the adjustment board exclusive jurisdiction over minor disputes, subject to very limited judicial review in the Federal courts. (45 U.S.C. §153 First (q) (1982); *Consolidated Rail Corp. v. Ry. Labor Executives' Association* (1989), 491 U.S. 299, 304, 105 L. Ed. 2d 250, 262, 109 S. Ct. 2477, 2480-81; *Union Pacific R.R. Co. v. Sheehan* (1978), 439 U.S. 89, 93, 58 L. Ed. 2d 354, 358, 99 S. Ct. 399, 402.) The procedures set forth in the RLA for resolution of minor disputes are mandatory; an employee may not opt against these procedures in favor of State-law actions for what amount to "grievances" under the RLA. (*Andrews v. Louisville & Nashville R.R. Co.* (1972), 406 U.S. 320, 32 L. Ed. 2d 95, 92 S. Ct. 1562.) The Supreme Court has observed that in enacting this legislation "Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts." *Union Pacific R.R. Co. v. Sheehan* (1978), 439 U.S. 89, 94, 58 L. Ed. 2d 354, 359, 99 S. Ct. 399, 402.

The railroads contend that plaintiffs' claims here constitute a minor dispute under the RLA and are thus subject to the exclusive jurisdiction of the NRAB. We note at the outset, as the cases reveal, that the RLA casts a

wide net into the arena of disputes arising between employees and their railroad employers. The Supreme Court has indeed indicated that the minor-dispute mechanism of the RLA sweeps within its governance even disputes which are not based on any specific provision of a collective-bargaining agreement. (See *Elgin, Joliet & Eastern Ry. Co. v. Burley* (1945), 325 U.S. 711, 723, 89 L. Ed. 1886, 1894, 65 S. Ct. 1281, 1290 (minor disputes as contemplated in the RLA include "omitted" cases, which are cases "founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective bargaining agreement"); *Consolidated Rail Corp.*, 491 U.S. 299, 105 L. Ed. 2d 250, 109 S. Ct. 2477 (If a railroad asserts a contractual right to take an action contested by its employees or their unions, then the resulting controversy is a minor dispute if the railroad's action is "arguably justified" by the terms of the parties' collective-bargaining agreement. The controversy is a major dispute if the railroad's claims to a contractual right are frivolous or obviously insubstantial). See also *Leu v. Norfolk & Western Ry. Co.* (7th Cir. 1987), 820 F.2d 825 (former railroad employees' State-law fraud and conversion claims against railroad based on railroad's alleged failure to pay medical expenses preempted by RLA even if railroad's alleged liability arose from "course and practice" of railroad rather than from specific provision of collective-bargaining agreement because question of railroad's obligation to pay expenses would require examination of railroad's "course and practice" in light of collective-bargaining agreement); *Ry. Labor Executives Association v. Atchison, Topeka & Santa Fe Ry. Co.* (9th Cir. 1970), 430 F.2d 994, 996 ("If the claim is founded upon some incident of the employment relationship, or an asserted one, the [Adjustment] Board may determine the meaning and effect of the provisions of the collective agreement with reference either

to an included or to an omitted case"); *Arbogast v. CSX Corp.* (N.D. W. Va. 1987), 655 F. Supp. 371, 372-73, *aff'd* (4th Cir. 1987), 831 F.2d 290 (RLA preempted action by former railroad employees alleging right to liquidated damages based on failure to pay wages earned prior to separation—"If a claim is founded on some incident of the employment relationship, it is immaterial, for purposes of coverage by the RLA, whether the claim is expressly covered by the collective-bargaining agreement, or is independent of that agreement").) It would appear, however, that not every dispute arising in the course of employment between an employer covered by the RLA and its organized employees is preempted by the RLA. See, *e.g., Colorado Anti-Discrimination Comm'n v. Continental Airlines, Inc.* (1963), 372 U.S. 714, 724, 10 L. Ed. 2d 84, 91, 83 S. Ct. 1022, 1027 (Neither RLA nor other Federal labor statutes preempted State-law claim for racial discrimination in hiring. Congress, in enacting the RLA, did not intend to bar States from protecting employees against racial discrimination); *Air Line Pilots Association v. UAL Corp.* (7th Cir. 1989), 874 F.2d 439 (RLA did not preempt State law regulating anti-takeover measures in context of dispute between airline pilots and airline over anti-takeover provisions in airline's collective-bargaining agreement with machinists' union).

The courts have articulated various standards for evaluating whether a claim couched in terms of a State-law cause of action is in fact a dispute subject to the exclusive jurisdiction of the NRAB. For example, in *Stephens v. Norfolk & Western Ry. Co.* (6th Cir. 1986), 792 F.2d 576, the court stated:

"Employees' attempts to evade NRAB exclusive jurisdiction over minor disputes by recharacterizing their claims into state causes of action are scrutinized by the following test: If the 'action is based on a matrix of facts which are inextricably intertwined with the grievance ma-

chinery of the collective bargaining agreement and of the R.L.A.,' exclusive jurisdiction of the NRAB preempts the action." (792 F.2d at 580, quoting *Magnuson v. Burlington Northern, Inc.* (9th Cir. 1978), 576 F.2d 1367, 1369.)

Similarly, in *Leu v. Norfolk & Western Ry. Co.* (7th Cir. 1987), 820 F.2d 825, the court observed that the "key inquiry" in such cases is " 'whether evaluation of the [State-law] claim is inextricably intertwined with consideration of the terms of the labor contract. If the state *** law purports to define the meaning of the contract relationship, that law is pre-empted.' " 820 F.2d at 830, quoting *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 213, 85 L. Ed. 2d 206, 216-17, 105 S. Ct. 1904, 1912.

In *Andrews v. Louisville & Nashville R.R. Co.* (1972), 406 U.S. 320, 32 L. Ed. 2d 95, 92 S. Ct. 1562, the Supreme Court held that a railroad employee, who, after recovering from injuries sustained in an accident, was allegedly not permitted by his employer to return to work, could not maintain a State-law "wrongful discharge" claim against his employer. The Court initially held that the RLA's procedures for the resolution of minor disputes are not optional, but are mandatory. (*Andrews*, 406 U.S. at 322-23, 32 L. Ed. 2d at 98-99, 92 S. Ct. at 1564.) The Court went on to find the RLA preemptive of the employee's claim because the existence of the employee's asserted right not to be discharged under the circumstances depended upon an interpretation of the collective-bargaining agreement between the employer and the employee's union. *Andrews*, 406 U.S. at 324, 32 L. Ed. 2d at 99, 92 S. Ct. at 1565.

In *Koehler v. Illinois Central Gulf R.R. Co.* (1985), 109 Ill. 2d 473, a railroad employee filed suit against his employer alleging "retaliatory discharge." This court held the employee's claim preempted by the RLA. Citing *Andrews v. Louisville & Nashville R.R. Co.* (1972), 406

U.S. 320, 32 L. Ed. 2d 95, 92 S. Ct. 1562, we rejected the employee's contention that because he had styled his claim as a cause of action in tort, rather than contract, the claim was not preempted by the RLA. We noted that the RLA's administrative remedy for such disputes " 'stems not from any contractual undertaking between the parties but from the Act itself.' " (*Koehler*, 109 Ill. 2d at 478, quoting *Andrews*, 406 U.S. at 323, 32 L. Ed. 2d at 99, 92 S. Ct. at 1565.) This court observed that "[t]he RLA is an elaborate and extensive administrative scheme." (109 Ill. 2d at 479.) We concluded that "[a] thorough reading of the RLA makes clear Congress' intent that employment-based disputes between parties covered by the RLA are to be resolved exclusively pursuant to the Act. *** State courts have no jurisdiction to hear and resolve such disputes." *Koehler*, 109 Ill. 2d at 480. See also *Jackson v. Consolidated Rail Corp.* (7th Cir. 1983), 717 F.2d 1045 (RLA preempted railroad employees' claim that he was discharged in retaliation for filing a Federal Employers' Liability Act complaint); *Graf v. Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1986), 790 F.2d 1341 (same).

Plaintiffs, relying principally on the Supreme Court's recent decision in *Lingle v. Norge Division of Magic Chef, Inc.* (1988), 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877, contend that the resolution of their claims does not require an interpretation or application of a collective-bargaining agreement and that their claims thus do not fall within the exclusive jurisdiction of the NRAB. The Supreme Court, in *Lingle*, held that section 301 of the Labor Management Relations Act (29 U.S.C. §185 (1982)) (LMRA) did not preempt an employee's State-law retaliatory discharge claim against her employer. The Court declared that "an application of State law is preempted by section 301 of the Labor Management Relations Act of 1947 only if such application requires the in-

terpretation of a collective-bargaining agreement."
(*Lingle*, 486 U.S. 399, 413, 100 L. Ed. 2d 410, 423, 108
S. Ct. 1877, 1885.) The Court reasoned that the elements of the State-law retaliatory discharge claim involved "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement." 486 U.S. at 407, 100 L. Ed. 2d at 419, 108 S. Ct. at 1882.

Section 301(a) of the LMRA provides, in part:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter *** *may be brought in any district court* of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." (Emphasis added.) (29 U.S.C. §185(a) (1982).)

The LMRA says nothing about actions which require the interpretation of the collective-bargaining agreement being preempted by the LMRA. That was read into the LMRA through construction of the italicized language above. The Supreme Court has recognized that section 301(a) is more than jurisdictional—that section "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." (*Textile Workers Union of America v. Lincoln Mills* (1957), 353 U.S. 448, 451, 1 L. Ed. 2d 972, 977, 77 S. Ct. 912, 915.) Thus, questions requiring an interpretation of a collective-bargaining agreement are to be answered by reference to Federal law. This rule is a necessary incident to the need for uniformity in the interpretation of collective-bargaining agreements. (*Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co.* (1962), 369 U.S. 95,

103-04, 7 L. Ed. 2d 593, 599, 82 S. Ct. 571, 577.) The corollary rule, however, as announced in *Lingle*, is that those claims which do not require an interpretation of a collective-bargaining agreement are not preempted by section 301(a).

Indeed, one year after our decision in *Koehler*, this court held that an employee's retaliatory discharge claim against his employer was *not* preempted by section 301(a) of the LMRA. (*Gonzalez v. Prestress Engineering Corp.* (1986), 115 Ill. 2d 1.) The court reasoned that an action in tort for retaliatory discharge is separate and independent from any action based upon a labor contract (115 Ill. 2d at 10), and would not require interpretation of any collective-bargaining agreement. (See also *Ryherd v. General Cable Co.* (1988), 124 Ill. 2d 418.) This court's reasoning in *Gonzalez* was thus consistent with the standard later annunciated by the United States Supreme Court in *Lingle*. This court distinguished *Koehler* by noting simply that "*Koehler* involved the preemptive effect of the Railway Labor Act (45 U.S.C. §§151 through 164 (1982)) and is therefore clearly inapposite." *Gonzalez*, 115 Ill. 2d at 11.

In light of the Supreme Court's decision in *Lingle*, plaintiffs urge us to reconsider our decision in *Koehler*, and to hold that the minor-dispute mechanism of the RLA preempts only those State-law claims which amount to disputes over the interpretation or application of a collective-bargaining agreement. We are aware of some authority supporting plaintiffs' position. (See, *e.g.*, *Lancaster v. Norfolk & Western Ry. Co.* (7th Cir. 1985), 773 F.2d 807, 814), and we would note that various tests utilized by the courts to evaluate whether the RLA preempts a State-law claim are actually quite similar to the standard announced in *Lingle*. (See, *e.g.*, *Stephens v. Norfolk & Western Ry. Co.* (6th Cir. 1986), 792 F.2d 576, 580; *Leu v. Norfolk & Western Ry. Co.* (7th Cir. 1987),

820 F.2d 825, 830.) The railroads, on the other hand, pointing to the extensive and compulsory administrative nature of the RLA, and to the policy of keeping minor disputes within the exclusive jurisdiction of the NRAB, argue that the preemptive force of the RLA is broader than that of the LMRA. There is ample authority for that position as well. We note that in a recent decision of the United States Court of Appeals for the Ninth Circuit, the court expressly recognized that the preemptive scope of the RLA is broader than that of LMRA section 301(a). (*Grote v. Trans World Airlines, Inc.* (9th Cir. 1990), 905 F.2d 1307, 1309-10.) We, however, need not pass on the question whether the preemptive force of the RLA is greater than that of LMRA. We continue to recognize, as we did in *Koehler*, that the RLA and the LMRA embody different schemes for dispute resolution—very different in many respects—and the policies underlying these statutes are not the same. We find it unnecessary, however, to decide in this case as the plaintiffs have requested, whether or not the holding of the Supreme Court in *Lingle* requires that *Koehler* be overruled. Even under the preemption test annunciated in *Lingle*, which plaintiffs assert is the correct test, plaintiffs' claims here are preempted by the RLA. These claims are inextricably intertwined with the parties' collective-bargaining agreements.

We pointed out above that section 301(a) of the LMRA, which we quoted, does not specifically state that in cases involving the interpretation of a collective-bargaining agreement Federal law governs. That construction was placed on the LMRA by the Supreme Court. However, the RLA specifically states that one of the general purposes of the RLA is "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation *or application* of agreements covering rates of pay, rules, or work-

ing conditions." (Emphasis added.) (45 U.S.C. §151a(5) (1982).) Therefore, under the RLA, both cases involving the interpretation and the application of such agreements are preempted by the Act. The resolution of the claims of the plaintiffs in our case will necessarily involve the interpretation or application of the agreements between the parties.

The Illinois Fraudulent Conveyance Act (Ill. Rev. Stat. 1987, ch. 59, par. 4) provides:

> "Every gift, grant, conveyance, assignment or transfer of, or charge upon any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to disturb, delay, hinder or defraud creditors or other persons, and every bond or other evidence of debt given, suit commenced, or judgment entered, with like intent, shall be void as against such creditors, purchasers and other persons."

We note again that this section has since been repealed and replaced with the Uniform Fraudulent Transfer Act (Ill. Rev. Stat. 1989, ch. 59, par. 101 *et seq.*), effective January 1, 1990.

Illinois recognizes two categories of fraudulent conveyances: those which are fraudulent in fact and those which are fraudulent in law. (*Anderson v. Ferris* (1984), 128 Ill. App. 3d 149, 152-53; *First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 791.) In fraud-in-fact cases a specific intent to "disturb, delay, hinder or defraud" must be proved. (*Anderson v. Ferris* (1984), 128 Ill. App. 3d 149, 152; *First Security Bank v. Bawoll* (1983), 120 Ill. App. 3d 787, 791; *Wilkey v. Wax* (1967), 82 Ill. App. 2d 67, 70. See also *Third National Bank v. Norris* (1928), 331 Ill. 230, 234 ("There must be evidence to show a fraudulent intent before a conveyance made upon a valuable consideration may be held fraudulent").) In fraud-in-law cases, on the other hand, a conveyance may be presumed fraudulent based on certain

circumstances surrounding the conveyance (*Anderson v. Ferris* (1984), 128 Ill. App. 3d 149, 153), and intent is immaterial (*Birney v. Solomon* (1932), 348 Ill. 410, 415). In order to establish that a conveyance is fraudulent in law, three elements must be present: (1) there must be a transfer made for no or inadequate consideration; (2) there must be existing or contemplated indebtedness against the transferor; and (3) it must appear that the transferor did not retain sufficient property to pay his indebtedness. *Mills v. Susanka* (1946), 394 Ill. 439, 448; *Anderson v. Ferris* (1984), 128 Ill. App. 3d 149, 153. See also *Second National Bank v. Jones* (1941), 309 Ill. App. 358, 365-66.

Plaintiffs make allegations in their complaint pertinent to both categories of fraudulent conveyances. Plaintiffs allege that they are creditors of C & NW because they have claims against C & NW for wages, vacation pay, personal or sick leave, pension contributions, and severance and employee benefits. The complaint makes no mention of a collective-bargaining agreement. Such artful drafting of the complaint, however, will not save plaintiffs' claims from preemption if they are in actuality a "minor dispute" under the RLA. Plaintiffs point out that the term "creditor" is construed liberally in this State for purposes of our creditor's rights law. (Citing *Bongard v. Block* (1876), 81 Ill. 186, 187; *Menconi v. Davison* (1967), 80 Ill. App. 2d 1.) But however liberally that term is construed, the relief plaintiffs seek in this action cannot be based on bald, unsupported allegations of creditor status. The circuit court in this case aptly observed that "[c]reditors' rights cannot be protected without close scrutiny of the derivation of those rights." Plaintiffs' creditor status in this case must be based on some contractual relationship with C & NW; some "agreement[ ] concerning rates of pay, rules or working conditions." (45 U.S.C. §153 First (i) (1982).) Plaintiffs

do not dispute that the employment benefits they seek to protect in this case are a subject of their collective-bargaining agreement with C & NW.

Plaintiffs, however, draw our attention to footnote 12 in *Lingle*, in which the Supreme Court stated:

> "A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a State-law suit is entitled. [Citation.] Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying State-law claim, not otherwise preempted, would stand." (*Lingle v. Norge Division of Magic Chef, Inc.* (1988), 486 U.S. 399, 413 n.12, 100 L. Ed. 2d 410, 423 n.12, 108 S. Ct. 1877, 1885 n.12.)

Plaintiffs assert that resolution of their fraudulent conveyance and civil conspiracy actions will require reference to the collective-bargaining agreement only with respect to the damages to which plaintiffs are entitled. We disagree. The Illinois Fraudulent Conveyance Act is not the source of the substantive rights plaintiffs here seek to protect. Plaintiffs are instead relying on the Fraudulent Conveyance Act as a means of protecting substantive rights arising pursuant to their collective-bargaining agreements with C & NW. Indeed, plaintiffs' standing to bring these actions is grounded upon their creditor status, which flows from the collective-bargaining agreements. The remedies sought by plaintiffs in this action will necessarily require inquiry into the validity and extent of the substantive rights plaintiffs seek to protect, and a definition of those rights. This will require examination, interpretation and application of plaintiffs' collective-bargaining agreements. Such is certainly not the sort of tangential reference to a collective-bargaining agreement referred to by the Supreme Court in *Lingle*.

In *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, a case virtually identical to the present case in relevant respects, railroad employees allegedly adversely affected by the sale of a portion of a railroad brought an action against their railroad employer claiming common law creditors' rights violations and violation of the Minnesota Uniform Fraudulent Transfer Act (Minn. Stat. Ann. §§513.41 through 513.51 (West 1990)). The *Deford* court held that the RLA preempted the employees' particular State-law claims because the resolution of those claims would require interpretation of the employees' collective-bargaining agreement with the railroad. The court reasoned that the "plaintiffs' allegations regarding 'creditors' rights' and 'creditor obligations' are based entirely upon supposed rights to unspecified and unquantified 'wages, benefits and labor protection' pursuant to the labor agreements." (*Deford*, 867 F.2d at 1086.) The court concluded that the plaintiffs there were "essentially claiming that if the sale of rail lines from Soo Line to Wisconsin Central is not, in effect, unwound, the transaction will result in a breach of Soo Line's obligations under the existing collective-bargaining agreements. Thus, by asserting State-law claims, [the plaintiffs seek] enforcement of the terms of the collective-bargaining agreements. The fraudulent conveyance act serves only as an enforcement mechanism. We believe [the plaintiffs are] only trying to invoke a State-law remedy in place of the mandatory and exclusive remedies of the Railway Labor Act ***." (867 F.2d at 1088.) The court thus held the State-law claims preempted by the RLA. With respect to RLA preemption of plaintiffs' State-law claims in the present case, we agree with the reasoning of the court in *Deford*.

Plaintiffs' complaint alleges that C & NW undertook the Duck Creek South Line sale with the intent to disturb, hinder, delay or defraud plaintiffs, that C & NW

deliberately kept plaintiffs uninformed about the impact the sale would have on plaintiffs as creditors of C & NW, that the conveyance is for less than fair consideration, and that FRVR will be left deeply in debt as a result of the transaction. Plaintiffs assert that C & NW's conveyance of "previously unencumbered assets" and the railroads' failure to keep plaintiffs informed about the consequences of the sale are "badges of fraud" from which a fraudulent intent can be inferred. Inquiry into the motives of C & NW with regard to this line sale will require careful consideration of the employment relationship between C & NW and plaintiffs-employees, a relationship which is the subject of a collective-bargaining agreement. Any inquiry into the allegedly adverse impact this sale will have on plaintiffs' rights will require close scrutiny of the various terms of the collective-bargaining agreement, for it is within the agreement that the allegedly threatened rights exist. The allegations that the sale is for less than fair consideration and that C & NW will use the proceeds of the sale to pay debts other than plaintiffs' debts are pertinent to the "fraud-in-law" category of fraudulent conveyances, and will require the court to determine whether C & NW will be left with sufficient assets to pay its debts. This will require the court to determine the extent and validity of the debts—here including the obligations owing plaintiffs pursuant to the parties' collective-bargaining agreement. We fail to see how a court could fashion a remedy for the protection of creditors' rights without consideration of the rights themselves. In the present case, such consideration will require reference to the terms of a collective-bargaining agreement. In sum, we conclude that the continuation of this suit will require much more than mere tangential reference to a collective-bargaining agreement.

Plaintiffs draw our attention to *International Association of Machinists & Aerospace Workers, IAM Local 437 v. United States Can Co.* (1989), 150 Wis. 2d 479, 441 N.W.2d 710, in which the supreme court of Wisconsin held that section 301(a) of the LMRA did not preempt a State-law fraudulent conveyance action brought by labor unions against two corporations to challenge a leveraged buyout. The court, in *United States Can*, reasoned that reference to a collective-bargaining agreement was required only to establish the unions' standing as creditors, and that such reference was merely "tangential." (*United States Can*, 150 Wis. 2d at 496-99, 441 N.W.2d at 717-19.) The dissenting justices in *United States Can* pointed out that the collective-bargaining agreement was the very source of the debts the unions sought to secure and that resolution of the unions' claims would "*undoubtedly* force the court to construe the meaning and import of the numerous provisions of the collective-bargaining agreement in light of the provisions and definitions of [State fraudulent conveyance law]." (Emphasis in original.) (150 Wis. 2d at 509, 441 N.W.2d at 723 (Ceci, J., dissenting).) We note that the Wisconsin case involved the LMRA while our case involves the RLA.

Also, in *International Association of Machinists & Aerospace Workers v. Allegis Corp.* (1989), 144 Misc. 2d 983, 545 N.Y.S.2d 638, a New York court held that the RLA did not preempt a fraudulent conveyance action brought by unions representing airline employees against the employer airline and its parent company. The court stated simply that resolution of the fraudulent conveyance claims would not require interpretation of any terms of a collective-bargaining agreement. (144 Misc. 2d at ___, 545 N.Y.S.2d at 642.) In *Allegis Corp.*, the court relied on *Ry. Labor Executives Association v. Pittsburgh & Lake Erie R.R. Co.* (3d Cir. 1988), 858

F.2d 936. That case, however, involved the complete pre-emption doctrine as it relates to jurisdiction of the Federal court and not claim preemption under the RLA. We, however, do not find *Allegis Corp.* or the majority opinion in *United States Can* persuasive, and we decline to follow them.

We further note that the present case is not the RLEA's only attempt to halt the Duck Creek South Line sale. Twice, the RLEA has sought in Federal court an injunction against the sale and to force the railroads to bargain with the RLEA over labor protective conditions on the sale. In each case, the Federal district court refused to enjoin the sale. The Federal district court in each case characterized the dispute over the sale of the Duck Creek South Line without labor protective conditions as a "minor dispute" under the RLA, subject to the exclusive jurisdiction of the NRAB. Our holding is consistent with these prior holdings of the Federal court, which involved these same transactions. The Federal court granted C & NW's requests for a preliminary, and later a permanent, injunction against a strike over the sale. In each case the United States Court of Appeals for the Seventh Circuit affirmed these rulings. *Chicago & North Western Transportation Co. v. Ry. Labor Executives' Association* (7th Cir. 1990), 908 F.2d 144; *Chicago & North Western Transportation Co. v. Ry. Labor Executives' Associations* (7th Cir. 1988), 855 F.2d 1277 (both recognizing that the sale without negotiation over labor protective conditions was arguably justified by the parties' collective-bargaining agreements).

If C & NW does actually squander away the proceeds of the Duck Creek South Line sale and does not pay plaintiffs the wages and other benefits due them under the terms of a collective-bargaining agreement, then C & NW will have breached the agreement. In that case, plaintiffs' sole avenue of relief would lie with the NRAB,

and plaintiffs apparently do not dispute this point. Plaintiffs in this case are seeking protection of rights resulting from the collective-bargaining process. The policy underlying the minor-dispute procedures of the RLA is to prevent interruptions of commerce, by strikes or lengthy court battles, in the railroad industry by keeping minor disputes within the jurisdiction of the adjustment board "and out of the courts." We believe that continuation of plaintiffs' present suit in State court would seriously interfere with that policy. This case is merely an attempt to evade the mandatory procedures of the RLA.

Plaintiffs here could well have bargained with C & NW over the consequences of a short line sale undertaken pursuant to *Ex parte No. 392*. They could have sought protection of their interests in that manner. Plaintiffs, however, insist that they are challenging only the "form" of this sale. Obviously, however, if plaintiffs can assert no prejudice to their interests as a result of the sale, then they certainly are in no position to undo the transaction by attacking its "form."

We similarly find that plaintiffs' civil conspiracy claim is preempted by Federal law. In *Bartley v. University Asphalt Co.* (1986), 111 Ill. 2d 318, this court held that section 301(a) of the LMRA preempted an employee's claim that his union engaged in a civil conspiracy in furtherance of an alleged retaliatory discharge by his employer. In support of his civil conspiracy claim, the employee, in that case, had alleged that the union conspired with the employer to breach the terms of the collective-bargaining agreement in force between the union and the plaintiff's employer, and further alleged that the union breached a statutory duty of fair representation of the plaintiff during the grievance proceedings established by the collective-bargaining agreement. This court held that the civil conspiracy claim was thus " 'inextricably intertwined with consideration of the terms of the la-

bor contract' " (*Bartley,* 111 Ill. 2d at 332, quoting *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 213, 85 L. Ed. 2d 206, 216, 105 S. Ct. 1904, 1912), and was preempted by the LMRA.

Similarly, in the present case, plaintiffs allege that the railroads engaged in a civil conspiracy to deprive plaintiffs of their rights as creditors. As discussed above, these rights are the subject of plaintiffs' collective-bargaining agreements. Resolution of the civil conspiracy claim will thus require consideration of the terms of these agreements. As in *Bartley,* we must conclude that the civil conspiracy claim is preempted by Federal law. We conclude, therefore, that plaintiffs' claims in this case constitute a "minor dispute" within the meaning of the RLA, which must be resolved pursuant to the provisions of that act.

We further agree with the appellate court that the Interstate Commerce Act (49 U.S.C. §§10101 through 11917 (1982)) preempts plaintiffs' claims here. Before a railroad may acquire or abandon a railroad line, the rail carriers involved must first obtain approval of the sale by the ICC. (49 U.S.C. §§10901, 10903 (1982).) Pursuant to the streamlined procedures set out in *Ex parte No. 392* (1985), 1 I.C.C.2d 810, the ICC authorized the sale of the Duck Creek South Line in this case, and later denied the RLEA's petition to revoke the exemption from regulation on this sale. For the following reasons, we conclude that the courts of this State are without authority to interfere with the sale by granting plaintiffs the relief they seek in this case.

The ICC's jurisdiction to approve or to condition approval of rail line transactions like the one challenged here is exclusive and plenary. (49 U.S.C. §§10501(d), 10901 (1982); *Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Association* (1989), 491 U.S. ____, ____, 105 L. Ed. 2d 415, 434, 109 S. Ct. 2584, 2596; *Chi-*

*cago & North Western Transportation Co. v. Kalo Brick & Tile Co.* (1981), 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124; *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1088-89.) In *Kalo Brick*, the plaintiff, a shipper, sought damages under Iowa law from the defendant railroad. The plaintiff alleged that it had suffered injury from loss of rail service as a result of the defendant's abandonment of a portion of the defendant's rail line. The ICC had previously authorized the abandonment. The Supreme Court held that the plaintiff's claims were preempted by the Interstate Commerce Act.

The Court initially observed that while Federal preemption of State law is generally disfavored, "a court must find local law preempted by Federal regulation when the 'challenged State statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Kalo Brick*, 450 U.S. at 317, 67 L. Ed. 2d at 265, 101 S. Ct. at 1130 (quoting *Perez v. Campbell* (1971), 402 U.S. 637, 649, 29 L. Ed. 2d 233, 242, 91 S. Ct. 1704, 1711, and *Hines v. Davidowitz* (1941), 312 U.S. 52, 67, 85 L. Ed. 581, 587, 61 S. Ct. 399, 404).) The Court went on to observe that "[t]he Interstate Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes" (*Kalo Brick*, 450 U.S. at 318, 67 L. Ed. 2d at 265, 101 S. Ct. at 1130), and that the ICC's authority over rail line abandonments is exclusive and plenary (*Kalo Brick*, 450 U.S. at 320, 67 L. Ed. 2d at 267, 101 S. Ct. at 1131). The Court added that "[t]he breadth of the [ICC's] statutory discretion suggests a congressional intent to limit judicial interference with the agency's work." *Kalo Brick*, 450 U.S. at 321, 67 L. Ed. 2d at 268, 101 S. Ct. at 1132.

In reversing the decision of the Iowa Court of Appeals, which held that the plaintiff's claims were not preempted by the ICA, the Supreme Court stated that

"[t]he decision below amounts to a holding that a State can impose sanctions upon a regulated carrier for doing that which only the [ICC], acting pursuant to the will of Congress, has the power to declare unlawful or unreasonable. *** It is difficult to escape the conclusion that the instant litigation represents little more than an attempt by a disappointed shipper to gain from the Iowa Courts the relief it was denied by the [ICC]." (*Kalo Brick*, 450 U.S. at 324, 67 L. Ed. 2d at 269, 101 S. Ct. at 1133-34.) The Court also noted that in its decision approving the abandonment the ICC had expressly addressed the basic issues the plaintiff sought to litigate in its State-law claims. (*Kalo Brick*, 450 U.S. at 326-27, 67 L. Ed. 2d at 270-71, 101 S. Ct. at 1134-35.) The Court held that "the Interstate Commerce Act precludes a shipper from pressing a state-court action for damages against a regulated carrier when the [ICC], in approving the carrier's application for abandonment, reaches the merits of the matters the shipper seeks to raise in state court." *Kalo Brick*, 450 U.S. at 331-32, 67 L. Ed. 2d at 274, 101 S. Ct. at 1137.

In *Hayfield Northern R.R. Co. v. Chicago & North Western Transportation Co.* (1984), 467 U.S. 622, 81 L. Ed. 2d 527, 204 S. Ct. 2610, the Supreme Court held that the Interstate Commerce Act did not preempt a condemnation proceeding pursuant to a State eminent domain statute against rail property abandoned pursuant to the provisions of the ICA. The Court reiterated that Federal preemption of State law is disfavored, and noted the "Congress has *not* 'unmistakably ordained' that the States may not exercise their traditional power of eminent domain over railroad property that has been abandoned." (Emphasis in original.) (*Hayfield*, 467 U.S. at 632, 81 L. Ed. 2d at 536, 104 S. Ct. at 2616-17.) The Court then observed that the relevant provisions of the ICA "relate to requirements that must be met *before* the

[ICC] will authorize an abandonment. Therefore, unless the [ICC] attaches postabandonment conditions to a certificate of abandonment, the [ICC's] authorization of an abandonment brings its regulatory mission to an end." (Emphasis in original.) (*Hayfield*, 467 U.S. at 633, 81 L. Ed. 2d at 537, 104 S. Ct. at 2617.) The ICC, in *Hayfield*, had granted the railroad a certificate of abandonment; the ICC's jurisdiction over the matter was thus terminated at that point. The Court further held that State condemnation proceedings do not interfere with the purpose of the ICC "insofar as such proceedings *follow* abandonment." *Hayfield*, 467 U.S. at 635, 81 L. Ed. 2d at 538, 104 S. Ct. at 2618.

In *Kalo Brick*, therefore, where the plaintiff was essentially challenging what the ICC had expressly authorized the railroad to do—abandon the rail line—the claim was preempted by the ICA. In *Hayfield*, however, there was no preemption where the ICC had authorized an abandonment and the plaintiff sought to condemn railroad assets over which the ICC retained no regulatory power. The present case is much more like *Kalo Brick* than *Hayfield* in relevant respects. Here, plaintiffs are essentially attempting to regulate, through State law, the same aspects of the same transaction over which the ICC has jurisdiction. See *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1081, 1089.

In the present case we, like the Supreme Court in *Kalo Brick*, must conclude that granting plaintiffs the legal and equitable relief they seek would impermissibly interfere with the ICC's broad authority over rail line transactions such as the one challenged in this action. It is true that *Kalo Brick* addressed rail abandonment under then section 1(18) of the ICA, recodified at 49 U.S.C. section 10903. But clearly, the ICC has broad authority, much like that in the case of abandonment, to regulate acquisitions under 49 U.S.C. section 10901

where the ICC deems it necessary to do so in order to carry out the transportation policy of 49 U.S.C. section 10101(a). The fact that the ICC ordinarily exempts from regulation short line sales, like the one before us, is the result of a considered policy evidenced in 49 U.S.C. section 10505 and expressed in *Ex parte No. 392* (1985), 1 I.C.C.2d 810, that regulation of such sales is generally neither necessary nor desirable. Plaintiffs attempt to distinguish *Kalo Brick* by pointing out that the ICC in the present case did not reach the merits of the claims plaintiffs now press in State court. Plaintiffs point out that nothing in the ICA even authorizes the ICC to consider whether a proposed sale would constitute a fraudulent conveyance under State law.

In *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, the court addressed a similar claim that the ICA preempts a State-law fraudulent conveyance action brought by railroad employees against their railroad employer. The court discussed the powers of the ICC in approving line sales:

> "In determining whether to approve a transaction, the ICC is directed to consider both the financial aspects of the sale of rail lines to the non-carrier and the impact of the sale upon all employees involved. *See* 49 U.S.C. §10901(a), (e). Furthermore, the ICC has discretion to condition its approval of a section 10901 transaction on the imposition of labor protective agreements containing a 'fair and equitable arrangement for the protection of the interests of railroad employees adversely affected by the transaction.' (49 U.S.C. §10901(e).)" *(Deford,* 867 F.2d at 1089.)

The *Deford* court concluded that "the ICA demonstrates Congress' intent to delegate to the ICC the exclusive responsibility to evaluate all aspects, including financial viability, of rail line transfers." *(Deford,* 867 F.2d at 1091.)

The court thus found that the plaintiffs' State-law claims, in that case, were preempted by the ICA.

We think it clear that the ICC was empowered to examine the various aspects of this line sale, including any possible adverse impact of the sale on C & NW employees. The ICC could have disapproved the sale or imposed upon it conditions for the protection of the very rights plaintiffs seek to protect in the present action. (49 U.S.C. §10901 (1982).) That the ICC did not do so to the satisfaction of plaintiffs does not give the courts of this State any authority to step into the picture and fashion a remedy for the protection of plaintiffs' alleged interests here. Plaintiffs again argue that they are not challenging the sale as such, but only the "form" of the sale. This is an interesting academic argument but it cannot distract us from the simple fact that, in essence, plaintiffs are urging the courts of this State to impose conditions on this sale where the ICC has declined to do so. This we cannot do. As the Supreme Court in *Kalo Brick* observed, "compliance with the intent of Congress cannot be avoided by mere artful pleading." (*Kalo Brick*, 450 U.S. at 324, 67 L. Ed. 2d at 269, 101 S. Ct. at 1134.) A thorough reading of the ICA's provisions pertinent to rail line acquisitions reveals that Congress intended to vest in the ICC, and not in State courts, the authority to examine the various aspects of such rail line transactions and to authorize and regulate those transactions. See *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1091. See also *Kalo Brick*, 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124.

Plaintiffs insist that the Federal district court's decision in *Terry v. Atlas Van Lines, Inc.* (N.D. Ill. 1986), 679 F. Supp. 1467, compels the conclusion that the ICA does not preempt plaintiffs' present claims. We disagree. *Terry* involved a dispute arising out of a nationwide moving company's termination of its agency relationship

with a local Illinois moving and storage company. The local carrier alleged that the national carrier's termination of the agency relationship violated the Illinois Franchise Disclosure Act (Ill. Rev. Stat. 1985, ch. 121½, par. 701 *et seq.*) (IFDA), which provided, in part, that termination of a franchise prior to its expiration must be founded on good cause. The national carrier pointed out that the ICC had approved the acquisition of a majority of its stock by another corporation, and argued that the IFDA claim was thus preempted by section 11341 of the ICA. That section provides in part:

"A carrier, corporation, or person participating in an approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction." (49 U.S.C. §11341(a) (1982).)

The district court held that the IFDA claim was not preempted because the exemption contained in section 11341 applied only *as necessary* to allow the franchises' operation. The exemption was unnecessary in *Terry* because the parties' agency agreement was construed as being terminable for cause during its term. Thus, the IFDA claim did not conflict with the provisions of the ICA. *Terry*, 679 F. Supp. at 1473.

In the present case, on the other hand, the operation of the Fraudulent Conveyance Act does conflict with the ICC authority over these short line sales. We hasten to emphasize that we do *not* hold, and the railroads do not suggest, that the ICA completely governs all aspects of railroad operations, or that it preempts all State law on the subject. But with respect to the ICC's authority to approve line acquisitions, we conclude that State law must give way.

The procedures outlined in 49 U.S.C. section 10505 evidence, and the ICC, in *Ex parte No. 392* (1985), 1 I.C.C.2d 810, expressly recognized, a policy favoring the sale and continuance of the operation of rail lines, as opposed to their abandonment. The ICC has accordingly established a streamlined procedure whereby it will, as a matter of course, exempt line sales of limited scope from regulation. The ICC can still impose on a sale conditions protective of employees who may be adversely affected thereby. Here, the ICC declined to do so. We believe that to superimpose the added strictures of our State fraudulent conveyance law on rail line sales undertaken pursuant to *Ex parte No. 392* would unduly interfere with the ICC's authority over rail lines sales. As the court, in *Deford,* observed, "it would be contrary to both the letter and the spirit of *Kalo Brick* to allow [the plaintiffs] to avoid the ICC's approval of the transaction pursuant to *Ex Parte No. 392* by pleading a state law claim." *Deford,* 867 F.2d at 1089.

Moreover, we agree with the railroads and the appellate court that there is yet another reason why Illinois courts cannot grant plaintiffs the injunctive relief they seek in this action. Pursuant to 28 U.S.C. section 2342:

> "The court of appeals *** has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ***
>
> ***
>
> (5) all rules, regulations, or final orders of the Interstate Commerce Commission ***."

In the present case, the ICC authorized the sale of the Duck Creek South Line pursuant to *Ex parte No. 392.* The ICC denied the RLEA's petition to revoke the exemption from regulation of the sale, and denied RLEA's request for a cease and desist order halting the sale. We do not believe that we can enjoin a sale which the ICC has authorized.

In *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1090, the court held that the plaintiffs' State-law fraudulent conveyance action was nothing more than an impermissible collateral attack on the ICC's approval of a rail transaction pursuant to *Ex parte No. 392.* Similarly, in *Ry. Labor Executives' Association v. Staten Island R.R. Corp.* (2d Cir. 1986), 792 F.2d 7, the ICC approved a rail line sale, and the RLEA sought to enjoin the sale on the ground that the sale of the line, without negotiated labor protective conditions and without adherence to the RLEA's notices seeking to amend collective-bargaining agreements, violated the RLA. The court of appeals affirmed the district court's dismissal of the RLEA's complaint. The court reasoned that the district court was without authority to grant RLEA the injunctive relief it sought because to do so would necessarily modify or rescind the ICC's order concerning the sale. The court concluded that 28 U.S.C. section 2342 precluded the district court from granting such relief. (*Staten Island,* 792 F.2d at 11-12.) In part, for the same reason, the United States district court refused to enjoin the same line sale with which we are here concerned. In his oral ruling denying RLEA's request for an injunction against the Duck Creek South Line sale, the trial judge stated:

"I cannot, I do not believe, enjoin the sale because I do not believe that a district court has the power to do so when the sale has been approved by the Interstate Commerce Commission. Title 28 USCS 2343 [*sic*] provides that 'the court of appeals has exclu[sive] jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validly of' ICC orders. *Chicago & North Western Transportation Co. v. Ry. Labor Executives' Association,* Dkt. No. 88 C 0444, Trans. of op. (N.D. Ill., March 16, 1988) aff'd on other grounds 855 F.2d 1277."

We similarly conclude that the courts of this State are without authority to enjoin, or to otherwise attempt to "undo," the sale of the Duck Creek South Line sale because the ICC has authorized the sale.

Plaintiffs posit, however, that granting them the relief they seek here would not interfere with any ICC order because the ICC did not mandate that the sale be consummated—it merely authorized the sale. Plaintiffs argue that they are merely suggesting that the sale must take a form which does not run afoul of Illinois fraudulent conveyance law. This argument was foreclosed by *Venner v. Michigan Central R.R. Co.* (1926), 271 U.S. 127, 70 L. Ed. 868, 46 S. Ct. 444. In *Venner*, the ICC approved an agreement between three railroads to acquire locomotives and pay for them by issuing certificates. Plaintiff, a minority stockholder of one of the railroads involved in the agreement, sued in State court seeking to enjoin the issuance of the certificates on the ground that the issuance would violate State law. The case was remanded to Federal district court, and the Federal court then dismissed the plaintiff's complaint on the ground that it essentially sought to annul or set aside an ICC order. The Supreme Court affirmed, agreeing that the suit was "essentially one to annul or set aside the order of the [ICC]. While the amended bill does not expressly pray that the order be annulled or set aside, it does assail the validity of the order and pray that the defendant company be enjoined from doing what the order specifically authorizes, which is equivalent to asking that the order be adjudged invalid and set aside." (*Venner*, 271 U.S. at 130, 70 L. Ed. at 869, 46 S. Ct. at 445. See also *Deford v. Soo Line R.R. Co.* (8th Cir. 1989), 867 F.2d 1080, 1090-91.) The language quoted similarly characterizes plaintiffs' efforts in the present case.

In sum, we conclude that plaintiffs' State-law claims in this case are preempted by Federal law. We find that the courts of this State are without jurisdiction to resolve those claims, and we, accordingly, affirm the dismissal of plaintiffs' complaint.

*Affirmed.*